APPEL, Justice.
Seventeen-year-old Desirae Pearson was convicted by a jury of two counts of first-degree robbery and two counts of first-degree burglary for her actions at two separate homes on Thanksgiving night in 2010. The district court sentenced her to serve concurrent sentences for the convictions arising from each transaction — one count of first-degree robbery and one count of first-degree burglary — but ordered those two sentences be served consecutively. Because each first-degree robbery conviction carries a sentence of twenty-five years imprisonment subject to a seventy percent mandatory minimum, Pearson received a fifty-year sentence and will be ineligible for parole until she serves thirty-five years. Pearson argues her sentence is cruel and unusual as applied to her under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution. For the reasons expressed below, we vacate Pearson’s sentence and remand the case to the district court for further proceedings.
I. Background Facts and Prior Proceedings.
Pearson was born in August 1993. According to her presentence investigation report, when she was six or seven years old, Pearson was hit by a car and hospitalized for several days. Though subsequent neurological and psychiatric testing did not reveal any particularized concerns, Pearson’s parents believed they saw changes in her behavior following the accident, especially with regard to anger management.
Prior to her arrest in the present matter, Pearson arguably had a penchant for simple misdemeanor theft and engaging in physical altercations. In 2002, she entered into an informal adjustment agreement following an allegation of fifth-degree theft.[1] In 2003, she was alleged to have engaged in assault and fifth-degree theft, but her case was held open for further review. In 2004, she was alleged to have engaged in an assault, but she was warned and her case was dismissed. In 2006, she received a warning after allegedly engaging in disorderly conduct. She also entered into a second informal adjustment agreement following an allegation of fifth-degree theft. In 2007, she was adjudicated delinquent for disorderly conduct following a fight with a fellow classmate at school. In 2008, she entered into her third informal adjustment agreement following an allegation of assault. Finally, in 2009, she was alleged to have engaged in disorderly conduct, again by fighting, but she was warned and her ease was dismissed. Importantly, though Pearson has been the subject of frequent law enforcement intervention, prior to her arrest in the present matter she had only been adjudicated delinquent one time and had never been the subject of an adult criminal proceeding.
At the time of her arrest, Pearson lived with her parents, her two sisters, and her two young nephews. She has two older brothers and two older stepsiblings who lived outside the home. Her father’s police record contained two convictions for operating while intoxicated. Her mother’s record was clean. Pearson’s parents perceived her as one who “is angry and fights,” but indicated she is a “smart girl” they would like to see remain at home to finish high school and have a career. Pearson’s parents perceived that Pearson *90 has a discipline problem. They resorted to grounding her as a method of punishment.
Prior to her arrest, Pearson was in eleventh grade at the local alternative high school. The presentence investigation report indicated Pearson spent much of her free time “running around with her friends.” She indicated that many of her friends were negative influences, and she claimed they were a significant reason she got into trouble. While Pearson did not acknowledge having a drug problem, she admitted to smoking marijuana daily as well as taking prescription drugs during the year prior to her arrest. Though she does not believe she has an alcohol problem, she admitted to consuming alcohol on the day of her arrest. A predisposition report in a previous juvenile court matter indicated, however, that in 2008 evaluators at the University of Iowa hospitals diagnosed Pearson with mild to moderate child-onset conduct disorder, alcohol abuse, cannabis abuse, mathematic disorder, and a reading disorder.
On November 25, 2010, Pearson and her boyfriend, Devon Lukinich, armed themselves with BB guns that looked like handguns and went on a robbery spree in Burlington and West Burlington. At the time, Pearson was seventeen years and three months old. Lukinich was also approximately seventeen years old. Pearson and Lukinich wore bandanas to conceal their faces and gloves to guard against leaving fingerprints. Pearson also wore a parka with a fur-lined hood pulled over her head.
Around 9:15 p.m., Pearson and Lukinich were allegedly involved in an altercation with a Burlington resident that led to a 911 call. Though Pearson and Lukinich had fled the scene by the time police arrived, the resident relayed information about Pearson’s vehicle to police, who then put out the description of the vehicle to officers in the area.
Around 9:45 p.m., Pearson and Lukinich knocked on the door of Zachary Moore. When Moore opened the door, Pearson pointed her BB gun at Moore and told him that he was being robbed. Lukinich then informed Moore that Pearson was not joking and that he would shoot him if Pearson would not. Lukinich told Moore he was looking for the “weed money” as well as two individuals. Moore testified he laid on the floor while the pair took his laptop, television, iPod, a handheld videogame game system, a small global positioning device (GPS), and some cash.
After reconnecting his landline telephone, which had been disconnected by Pearson and Lukinich when they rummaged through his apartment, Moore called the police. When police arrived, Moore found his cell phone with the battery disconnected on his front step. Moore testified he believed Lukinich was in control of the robbery because Lukinich checked the other rooms of Moore’s home while Pearson sat on the couch, was the one who unhooked the television, and was the only one who spoke after they entered the apartment.
Pearson and Lukinich returned home to unload their loot.[2] The pair lived in the basement of a house owned by Lukinich’s mother’s boyfriend. Pearson and Lukinich then went to a McDonald’s, where they purchased strawberry milk shakes.
Later that night, Pearson and Lukinich entered the home of Joan Wright, an eighty-one-year-old woman, and her son, Ronald Wright. At the time, Joan was in *91 bed and Ronald was in the basement. Lukinich climbed through a kitchen window and opened a door for Pearson. Pearson took cash out of a purse that was sitting on the kitchen table. The pair also took three pill bottles containing prescription medication. Lukinich then went into an unoccupied bedroom, while Pearson stood in the hallway just outside the doorway. After hearing noises and seeing the shadows of people she did not recognize, Joan got out of bed to investigate. She saw Lukinich in her son’s bedroom, holding Ronald’s two shotguns in their cases. Lukinich told Joan to go back to her bedroom, and Pearson told Joan to do as she was told. Lukinich and Pearson then opened their jackets, revealing the BB guns. When Joan yelled to her son that they were being robbed, Lukinich pushed her backward into a doorframe. The force of the blow fractured her shoulder. Luki-nich decided to take one of Ronald’s shotguns, and the pair left the home. Police responded to the Wrights’ home around 11:44 p.m.
Just moments after they left the Wrights’ home, police apprehended Pearson and Lukinich in their car. At the time, Pearson was driving. After securing warrants to search the vehicle, police found pill bottles bearing the names of Joan and Ronald. They recovered Ronald’s shotgun and cash matching the amount stolen from Moore and Joan. They also discovered two BB guns, BBs, two bandanas, a stocking, and two pairs of gloves. When the officers first viewed the BB guns in the trunk of the vehicle, the officers thought the weapons were real handguns. One of the BB guns bore a strong resemblance to a Glock model 80 handgun and the other to a Taurus PT 1911 handgun.
On May 4, 2011, a jury found Pearson guilty of first-degree robbery and first-degree burglary for her actions at Moore’s house. The jury also found her guilty of first-degree robbery and first-degree burglary for her actions at the Wrights’ house.[3]
Roughly two weeks later, Pearson wrote a letter to the district court in which she admitted the facts of each crime in substantially the same way they were presented at trial. According to Pearson, she took some pills, “chilled” at home for a while, and went to her family’s house. She and Lukinich then shoplifted two stores before Lukinich suggested they go to an elderly woman’s home, presumably for the purpose of committing a theft. While they were hiding in the bushes outside the woman’s home, Pearson wrote, Lukinich saw someone in Pearson’s car. Pearson stated they yelled at the man and started shooting at his house. They got into the car and, as they pulled away, a man came out of a house with a gun. Lukinich leaned out the window and continued firing shots.
According to Pearson, Lukinich then suggested going to another house where marijuana was located. Pearson indicated that Lukinich told her to knock on the door, that she told the person who answered the door (Moore) “to get down,” and that Lukinich stated he would shoot the man if she would not. Pearson admitted to taking cash and a laptop while looking for marijuana. She stated Lukinich stole the television and the iPod. She then admitted to dropping the stolen items off at home before going to McDonald’s to get strawberry milk shakes.
After driving around for some time, the pair stopped to check out another house (the Wrights’). Pearson wrote that Luki- *92 nich climbed through a window and unlocked the door for her, that they took some pills and cash from the kitchen, and that although she told Lukinich they should leave, he started to look through another room. Pearson recounted how Joan confronted them, how Lukinich told Joan to go back to bed, how she repeated Lukinich’s statement to Joan, and how Lukinich showed Joan his weapon. Pearson stated she started to leave before hearing stumbling and observed Lukinich behind her. Pearson then noted their car was stopped moments later by police.
After expressing remorse for her actions, the victims, and her family, Pearson admitted that she deserved punishment for her conduct, but requested that she receive a lesser sentence than the maximum she was facing. She wrote, “I always thought that going to prison could not happen to me because I would never do anything serious enough for it to happen.” Pearson continued, “I know now it can ' happen to anyone if you don’t think before you act, if you are under the influence, and if you think you won’t get caught.”
In mid-July, Pearson wrote a second letter to the district court. In this letter, Pearson stated she was “not the person who committed those crimes” because at the time she “was influenced and on drugs.” Pearson asked for “a second chance to live [her] life other than behind bars.” She also expressed remorse for the victims and asked for “another punishment instead of spending 25 years in prison.”
Pearson and Lukinich appeared for sentencing on July 22. Ronald Wright gave an impact statement in which he stated his mother spent two months in rehab following surgery. He also expressed his opinion that Pearson and Lukinich should receive at least half of their potential total sentence. A victim coordinator read Joan Wright’s impact statement aloud. Joan’s statement informed the district court that her injuries sustained during the robbery required the implantation of a metal plate in her shoulder, secured by twenty to twenty-five screws and pins.[4] Joan’s statement reiterated that she spent two months in the hospital and a nursing home following surgery and indicated she still experienced pain in her arm. Joan stated that she suffered from worsening vision problems because she missed an eye appointment following her shoulder surgery, that she was still frightened to be left alone at home, and that she missed taking flowers to her mother’s grave on Christmas because she was in the nursing home. The victim coordinator read a similar statement from Moore, who indicated that he was still negatively affected by the events of the robbery and that he believed Pearson and Lukinich should receive life sentences.
The State asked the district court to order concurrent sentences for Pearson for the robbery and burglary at Moore’s home and concurrent sentences for the robbery and burglary at the Wrights’ home. The State further requested that the sentences stemming from each transaction run consecutively to result in a total of fifty years.
Pearson’s attorney acknowledged the mandatory mínimums and argued Pearson should be sentenced to concurrent sentences totaling twenty-five years. Pearson’s attorney cited the United States Supreme Court’s statements that juveniles are less deserving of the most severe punishments due to their lessened culpability and that juveniles “must have some mean *93 ingful opportunity to obtain release based upon demonstrated maturity and rehabilitation.” Pearson’s attorney argued that if Pearson was released on parole after serving 17.5 years, the mandatory minimum of a twenty-five-year sentence, she would be more likely to be able to contribute to society in a meaningful way than she could if released in her fifties. When the district court asked Pearson for her statement, she replied that she did not have anything to say other than what she included in her written statement to the court.
In sentencing Pearson to fifty years, the district court found that while her file reflected a troubled family life, a troubled history, the lack of a support structure, and negative influences, these circumstances did not justify her criminal actions. The court considered Joan’s serious injuries and the fact that the victims did not feel safe in their homes. The court emphasized Pearson and Lukinich had “thrown their futures away,” stating, “It’s a tragedy in terms of your futures. There is no doubt that it’s a waste of your lives, but it’s the unalterable choice that you have made.”
The district court continued,
I understand the argument that as young people you may not have had wisdom and the ability to distinguish what the result of your actions were going to be, but it doesn’t dimmish in any way the results of your actions.
The district court then observed Pearson had prior experience with the court system, stating, “[T]he court system has been trying for years to provide Miss Pearson with the support, the education, the training, the life skills necessary to turn her life around. She hasn’t done so.”
The district court found Pearson had committed a series of bad choices. The court recognized that Pearson was one month shy of her eighteenth birthday at the time of sentencing and that her record indicated five curfew violations as well as a number of other matters processed by the juvenile court system. It further noted that she had been expelled from the traditional school system in ninth grade, that she worked at McDonald’s, and that she had parents and siblings in the area. The district court found that Pearson had a recurring issue with assaults since the age of fourteen and that she and her family had been provided with numerous services to address and resolve underlying issues. The court expressed its belief that Pearson and others who wrote statements in her favor wanted to blame her friends, alcohol use, drug use, a bad family relationship, and poor parenting, but that “the bottom line is that you are responsible for your actions and you’re responsible for your choices.” The court continued, “What is clear is that you knew what you were doing, you understood the impact that it was going to have on your victims, and you did it.”
The district court interpreted Pearson’s second letter requesting a punishment other than a twenty-five-year sentence as asking for an alternative form of punishment to a prison sentence, to which it stated, “That’s not the reality here. There is no alternative. The only question before the court today is whether the four sentences will run concurrently or consecutively.” The court found Pearson’s second letter signified Pearson did “not understand the significance of the crime that [she had] committed and the impact,” based on the fact she had been repeatedly informed each conviction carried a twenty-five-year sentence.
The district court also expressed concern the judicial system was providing “repeated opportunities to young offenders to avoid the ramifications of their actions.” The court continued, “I think people truly *94 believe that anything you do prior to turning 18 is gone on your 18th birthday, and that’s not the case.” The court concluded granting four concurrent sentences on four class “B” forcible felonies “would imply that a criminal defendant can only receive one sentence regardless of the number or seriousness of their crime,” which would “continue to send the wrong message to any other individuals considering committing criminal acts.”
In addition, the district court acknowledged the Supreme Court’s statements about juveniles with regard to their “immature decision-making and their ability to change and rehabilitate.” The district court indicated its belief that juveniles should have “the opportunity to do those things, and the benefit of having some meaningful opportunity to ultimately be released.”
Finally, after the court recognized that a potential release date is often a motivating factor to an inmate, it stated the primary purpose of Pearson’s sentencing was protection of the public, not rehabilitation. The court stated, “I don’t believe that the focus here today should be on the rehabilitation of the defendants, but rather the protection of society in these particular cases.” The district court explained,
The question of whether Miss Pearson will be able to contribute to society in any meaningful way is not really the issue that the Court finds determinative, particularly in the face of the fact that Miss Pearson has previously received any number of rehabilitation attempts in the past to set her on the correct path without success.
After sentencing Pearson, the district court concluded by saying it did not take the sentencing of juveniles to lengthy prison terms lightly. It also expressed its hope Pearson would take advantage of the rehabilitative and educational programs offered in prison so that she could ultimately return to the community at the appropriate time.
Pearson appealed, and we transferred her case to the court of appeals. The court of appeals upheld Pearson’s sentence. The court of appeals determined Pearson’s actions fell “squarely within the well-defined parameters” of the robbery statute. The court of appeals agreed with the findings of the district court that Pearson was nearly an adult when she committed her crimes, that she had a history of assaultive behavior, and that she had failed to take advantage of rehabilitative opportunities. The court acknowledged Pearson would have to spend the majority of her life in prison, but held her sentence was not disproportionate to her crimes, finding the district court had properly considered Pearson’s age.
We granted further review.
II. Standard of Review.
A challenge to a sentence as illegal may be brought at any time. State v. Bruegger, 773 N.W.2d 862, 869 (Iowa 2009). We review constitutional challenges to illegal sentences de novo. Id.
III. Discussion.
A. Positions of the Parties. Pearson argues her sentence is unconstitutional as applied to her under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution. Pearson notes that she was only seventeen years old at the time of the crimes and that under the district court’s sentence, she is not eligible for parole until she is almost fifty-three years old. She argues the district court was not interested in rehabilitation, but rather solely in incapacitation. Pearson argues that she never took the lead in any of the robberies *95 and that she took only minimal actions secondary to those of Lukinich, who threatened to shoot Moore, who was more active in looking for items to steal in the homes of Moore and the Wrights, and who pushed Joan Wright to the ground. She also cites her relationship with Lukinich and her obvious immaturity.
Pearson also argues a seventy percent mandatory minimum for first-degree robbery is not in line with other offenses subject to seventy percent mandatory mín-imums as applied to her. She asserts the aggregated seventy percent mandatory mínimums lead to punishment far harsher than that imposed in other jurisdictions for similar crimes.
The State responds that the thirty-five-year minimum sentence is not grossly disproportional under the test outlined by the United States Supreme Court in Rummel v. Estelle, 445 U.S. 268, 100 S.Ct. 1138, 63 L.Ed.2d 382 (1980), Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), and Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (plurality opinion). The State argues that even if Pearson’s case warrants an as-applied review, this court should defer to the legislature because the legislature is the “clearest and most reliable objective evidence of how our society views a particular punishment today.” The State asserts Pearson’s sentence is not grossly disproportionate to her crime because of the nature of the crimes which caused the victims fear and pain. The State points to Pearson’s history with the juvenile justice system as support for the proposition that her sentence fits her crime. The State then turns to intrajurisdictional and inter-jurisdictional analyses, concluding Pearson has failed to establish either prong. The State further argues that to the extent Pearson has raised a claim under the Iowa Constitution, she fails to demonstrate her case is a “rare” case warranting an as-applied review. See Bruegger, 773 N.W.2d at 884.
B. Analysis. At the outset, we consider the applicability of the United States Supreme Court’s approach in Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), to Pearson’s sentencing. In State v. Null, 836 N.W.2d 41 (Iowa 2013), also decided today, we explored in detail the contours of Miller, as well as the Supreme Court’s decisions in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). We need not repeat the analysis here. In Null, we reversed a juvenile’s sentence and remanded the case to the district court for reconsideration in light of Miller. 836 N.W.2d at 76. On remand, we emphasized the district court must recognize that because “ ‘children are constitutionally different from adults,’ they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing.” Id. at 74 (quoting Miller, 567 U.S. at-, 132 S.Ct. at 2464, 183 L.Ed.2d at 418). We emphasized that if the district court believes an exception to this general rule applies, the district court should make specific findings. Id. In making such findings, we required the district court to “go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing.” Id. at 74-75 (citing Graham, 560 U.S. at -, 130 S.Ct. at 2032, 176 L.Ed.2d at 847, and Roper, 543 U.S. at 572-73, 125 S.Ct. at 1197, 161 L.Ed.2d at 24). We stated the typical characteristics of youth, such as immaturity, impetuosity, and poor risk assessment, are to be regarded as mitigating instead of aggravating factors. Id. at 75 *96 (citing Miller, 567 U.S. at -, 132 S.Ct. at 2467-69, 183 L.Ed.2d at 422-24).
In addition, we emphasized the district court must recognize that “ ‘[¡Juveniles are more capable of change than are adults’ and that as a result, ‘their actions are less likely to be evidence of “irretrievably depraved character.” ’ ” Id. (quoting Graham, 560 U.S. at -, 130 S.Ct. at 2026, 176 L.Ed.2d at 841). We noted that while some juvenile offenders might be irreparably lost, it is very difficult to identify those falling into that category and that even trained psychologists have difficulty making this type of prediction. Id.; accord Graham, 560 U.S. at -,-, 130 S.Ct. at 2026, 2029, 176 L.Ed.2d at 841, 844; Roper, 543 U.S. at 573, 125 S.Ct. at 1197, 161 L.Ed.2d at 24. “Because ‘incorrigibility is inconsistent with youth,’ care should be taken to avoid ‘an irrevocable judgment about [an offender’s] value and place in society.’ ” Null, 836 N.W.2d at 75 (quoting Miller, 567 U.S. at -, 132 S.Ct. at 2467, 183 L.Ed.2d at 422). Finally, in Null, a case involving a homicide, we indicated a very long prison sentence of more than fifty-two years without the possibility of parole should be “rare or uncommon.” Id.
Here, the district court sentenced Pearson to consecutive terms totaling thirty-five years imprisonment without the possibility of parole. We think in light of the principles articulated in Miller and Null that it should be relatively rare or uncommon that a juvenile be sentenced to a lengthy prison term without the possibility of parole for offenses like those involved in this case. Otherwise, we would be ignoring the teaching of the Roper-Graham-Miller line of cases that juveniles have less culpability than adults, that the few youth who are irredeemable are difficult to identify, and that juveniles have rehabilitation potential exceeding that of adults.
Though Miller involved sentences of life without parole for juvenile homicide offenders, its reasoning applies equally to Pearson’s sentence of thirty-five years without the possibility of parole for these offenses. 567 U.S. at -, 132 S.Ct. at 2465, 183 L.Ed.2d at 420 (concluding that nothing Graham “said about children— about their distinctive (and transitory) mental traits and environmental vulnerabilities — is crimespecific”); accord Null, 836 N.W.2d at 65, 71. Therefore, we think a minimum of thirty-five years without the possibility of parole for the crimes involved in this case violates the core teachings of Miller. We think the principles in Miller as developed by the Supreme Court in its Eighth Amendment jurisprudence are instructive on the resolution of this case. As in Null, we independently apply article I, section 17 of the Iowa Constitution, adopt the principles underlying Miller, and apply them to the facts of this case. See 836 N.W.2d at 70 & n. 7; see also Bruegger, 773 N.W.2d at 883-84.
We have no occasion to consider whether Miller’s principles must be applied to all juvenile sentences. Instead, we need only decide that article I, section 17 requires an individualized sentencing hearing where, as here, a juvenile offender receives a minimum of thirty-five years imprisonment without the possibility of parole for these offenses and is effectively deprived of any chance of an earlier release and the possibility of leading a more normal adult life.
Nothing in Bruegger is to the contrary. In Bruegger, we considered whether the sentence imposed upon an adult amounted to cruel and unusual punishment. 773 N.W.2d at 878-88. While the adult sentence was enhanced by juvenile adjudication, prevailing federal law, which Brueg-ger did not contest, emphasized that such sentences should be treated as adult sentences for adult crimes. 773 N.W.2d at *97 885-86. Further, though we indicated an as-applied challenge brought by an adult convicted of crime should be rare and described the circumstances that made Bru-egger’s case meet that demanding standard,[5] but we did not circumscribe or limit the types of as-applied challenges that may be made under the Eighth Amendment or article I, section 17 of the Iowa Constitution for adult convictions, let alone juvenile convictions, or indicate the factors considered were applicable in every case or exhaustive. Id. at 884-85. Certainly, nothing in Bruegger should be read as contrary to the principles of the Roper-Graham-Miller trilogy with respect to sentences imposed as a result of juvenile convictions.
We also note that the district court here did not have the benefit of Miller or Null when it sentenced Pearson. Our review of the district court’s handling of Pearson’s sentencing convinces us the district court did not consider the principles underlying Miller. For example, the district court indicated it understood the argument that Pearson, as a young person, may lack the ability to appreciate the results of her actions, but then stated that argument “doesn’t diminish in any way the results of [her] actions.” It is true that Pearson’s youthfulness does not lessen the results of her actions insofar as the impact they had on the lives of the victims, yet under Miller and Null, a juvenile’s culpability is lessened because the juvenile is cognitively underdeveloped relative to a fully-developed adult. Miller, 560 U.S. at -, -, 132 S.Ct. at 2464-69, 2475, 183 L.Ed.2d at 418-24, 430; Null, 836 N.W.2d at 74. This lessened culpability is a mitigating factor that the district court must recognize and consider. Miller, 560 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424; Null, 836 N.W.2d at 74.
The district court declared, “[T]he bottom line is that you are responsible for your actions and you’re responsible for your choices.” The court further stated Pearson did “not understand the significance of the crime that [she had] committed and the impact.” While it is true that juveniles lack the maturity to fully understand the consequences of their actions, under Miller and Null .this too is a mitigating factor. Miller, 567 U.S. at -, 132 S.Ct. at 2468-69, 183 L.Ed.2d at 422-23; Null, 836 N.W.2d at 74. Again, the district court did not treat it as such.
Finally, the district court stated, “I don’t believe that the focus here today should be on the rehabilitation of the defendants, but rather the protection of society in these particular cases.” Yet, under Miller, Graham, and Null, rehabilitation is an important factor and to predict that a juvenile cannot be rehabilitated is very difficult. Miller, 567 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424; Graham, 560 U.S. at -, -, 130 S.Ct. at 2026, 2029, 176 L.Ed.2d at 841, 844; Null, 836 N.W.2d at 75; see also Roper, 543 U.S. at 573, 125 S.Ct. at 1197, 161 L.Ed.2d at 24. The district court should have considered rehabilitation as a factor in sentencing Pearson.
In sum, the district court emphasized the nature of the crimes to the exclusion of the mitigating features of youth, which are required to be considered under Miller and Null. Accordingly, we vacate Pearson’s sentence and remand the case to the district court for application of the Miller standards as described in Null and this opinion.
*98 Based on this disposition, it is unnecessary for us to address other arguments raised by Pearson in challenging her sentence. We do not consider, for instance, whether the sentence would violate the proportionality concepts of Weems v. United States, 217 U.S. 349, 367, 30 S.Ct. 544, 549, 54 L.Ed. 793, 798-99 (1910), Solem, Ewing, or any other proportionality test that might be applied in this case or any other issue related to Pearson’s sentencing. These challenges are not ripe at this time and must wait until after the district court has resentenced Pearson.
IV. Conclusion.
For the above reasons, we vacate the sentence imposed by the district court and remand the case to the district court for further proceedings.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED AND CASE REMANDED.
All justices concur except CADY, C.J., who concurs specially; and MANSFIELD, WATERMAN, and ZAGER, JJ, who dissent.
ZAGER, J., also writes a separate dissent.

. Under Iowa Code section 714.2(5), theft of property not exceeding $200 in value is fifth-degree theft. It is classified as a simple misdemeanor. Iowa Code § 714.2(5) (2001).

. Police later recovered Moore’s iPod and laptop in the basement but as of the time of the trial they had not recovered his television. No mention was made at trial as to the recovery of the portable gaming system or the GPS.

. The jury found Lukinich guilty of the same crimes.

. At trial, Joan's surgeon testified that Joan would not regain full strength or full mobility in her shoulder.

. In Bruegger, the particular circumstances were a broadly framed underlying crime, Bru-egger’s young age when he committed the prior offense, and a geometric increase in penalty due to the enhancement resulting from the juvenile adjudication. 773 N.W.2d at 884-85.