# IN THE COURT OF APPEALS OF IOWA

No. 15-0617
Filed April 27, 2016

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**J.D. WILBERT LOUIS TUECKE,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Clayton County, John J. Bauercamper, Judge.

A defendant convicted of two counts of second-degree sexual abuse as a juvenile with an intellectual disability challenges the district court's decision to reimpose the "mandatory" minimum sentence term of service as part of his sentence. **AFFIRMED.**

Scott J. Nelson, Dubuque, for appellant.

Thomas J. Miller, Attorney General, and Tyler P. Buller, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

A defendant diagnosed with a mild intellectual disability was convicted of two counts of second-degree sexual abuse for acts committed when he was a juvenile. He filed a motion to correct his sentences in 2015, and following a resentencing hearing, the district court elected to reimpose his prior sentences, including the statutory requirement that he serve at least seventy percent of the maximum term of his sentences. He now appeals the constitutionality of those sentences, based upon his intellectual disability and age at the time the crimes were committed. We affirm.

### I. Background Facts and Proceedings.

J.D. Tuecke was born in April 1990. In May 2008, he was charged by trial information in district court with two counts of second-degree sexual abuse, in violation of Iowa Code section 709.3(2) (2007), class "B" felonies. The trial information alleged that during the summer of 2007, Tuecke sexually abused two children under the age of twelve.

Tuecke was seventeen-years old when he committed the alleged acts, and he requested jurisdiction be transferred to the juvenile court. Thereafter, a juvenile-court officer filed a report to the district court, noting, among other things, that Tuecke had a learning disability and had been provided special education services via an individualized education plan. Additionally, the report stated:

> During the investigation of the matter . . . , the Public Defender's Office and Assistant County Attorney . . . provided information regarding a possible manner of handling this case. The proposal would allow for the Transfer of Jurisdiction of the case involving J.D. Tuecke, specifically, two counts of [second-degree sexual abuse], to the juvenile court. The juvenile court would then immediately recommend waiver of jurisdiction to the criminal

> division of the district court. This proposal would allow the court many sentencing options which are not available in the current filing due to the mandatory sentencing.

The juvenile-court officer recommended the court proceed in the suggested manner, and Tuecke, represented by counsel, agreed to the plan. Tuecke subsequently pled guilty in district court to two counts of second-degree sexual abuse; he received a deferred judgment and was placed on probation. *See also* Iowa Code §§ 901.5(1) (permitting the sentencing court to defer judgment and sentence if authorized by section 907.3), 907.3(1) (permitting the sentencing court to defer judgment and sentence with the defendant's consent unless certain facts exist, not present here), 907.5 (requiring the sentencing court to first determine which sentencing "option, if available, will provide maximum opportunity for the rehabilitation of the defendant and protection of the community from further offenses by the defendant and others" after considering "the age of the defendant; the defendant's prior record of convictions and prior record of deferments of judgment if any; the defendant's employment circumstances; the defendant's family circumstances; the nature of the offense committed; and such other factors as are appropriate"); *but see id.* § 902.12(3) (requiring a person serving a sentence for a conviction of second-degree sexual abuse under section 709.3 to serve "at least seven-tenths of the maximum term of the person's sentence").

In August 2009, Tuecke was now over the age of eighteen, and Tuecke's probation officer reported Tuecke had violated the terms of his probation. Tuecke was also charged with second-degree burglary. Although Tuecke admitted the violations, the court allowed him to remain on probation but modified

its terms to require that Tuecke (1) reside at a residential treatment facility for a year or until he obtained maximum benefits from available programming, (2) successfully complete the sex-offender-treatment program (SOTP), and (3) have no contact with his victims. Tuecke also pled guilty to the second-degree-burglary charge, and he received a ten-year suspended sentence with placement at the residential treatment facility.

In August 2010, Tuecke's probation officer filed another report of violation alleging numerous probation violations. His probation officer noted that Tuecke's negative behaviors were escalating and that it appeared Tuecke was "a threat to the community safety and a high risk to sexually re-offend." Tuecke had destroyed facility property, evidencing Tuecke was "capable of acting in a physically aggressive manner," and he seemed "either unwilling or unable to curtail and control [his] defiant thinking and behavior that could ultimately lead to another hands-on victim." Tuecke had breached the terms of his SOTP contract in numerous respects, such as possessing pornographic materials, performing sex acts on another resident in the facility, and making sexually-inappropriate comments.

A hearing on the alleged probation violations was subsequently held. Ultimately, the court determined Tuecke's deferred judgment should be revoked, and it imposed the judgment it previously deferred, sentencing Tuecke to serve a minimum term of confinement of seventeen-and-one-half years on the two counts, to be served concurrently, and to be served consecutively with the term imposed upon his second-degree burglary conviction.

In January 2015, following the Iowa Supreme Court's decision in *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014), Tuecke filed a motion to correct his illegal sentence. In *Lyle*, the court determined "all mandatory minimum sentences of imprisonment for youthful offenders are unconstitutional under the cruel and unusual punishment clause in article I, section 17 of [the Iowa] constitution." 854 N.W.2d at 401. Because Tuecke was a youthful offender when he committed his two acts of sexual abuse in 2007, Tuecke requested he be resentenced.

The State stipulated that under *Lyle* Tuecke must be resentenced, and the court set the matter for hearing and directed that a new presentence investigation report (PSI) be prepared. The "Psychological Report" section of the PSI, completed in March 2015, noted Tuecke had three psychiatric diagnoses: mild recurrent major depressive disorder, mild intellectual disability, and pedophilia. His intellectual functioning was described as follows:

> Mr. Tuecke was given the [Wechsler Adult Intelligence Scale test] . . . and scored a 67. [The Iowa Department of Corrections (DOC)] is currently converting psychiatric diagnoses to the new DSM-5 codes from DSM-IV-TR. The DSM-5 criteria for Intellectual Disability now requires evidence of both intellectual and adaptive deficits. Mr. Tuecke no longer meets the criteria for this diagnosis as he lacks adaptive deficits. To further corroborate this conclusion, his [Test of Adult Basic Education] reading level improved from 3.8 (equivalent grade level) [in January 2011] to 6.3 [in August 2011], a span of six months. His reading was tested a third time [in January 2014] at 7.0. He is a high school graduate. The [Saint Louis University Mental Status Exam] administered [in June 2013] showed no evidence of dementia. This exam also revealed that [Tuecke] has a basic command of math, knowledge acquisition and recall, concrete reasoning, and auditory memory. These demonstrated skills, when considered together, also point towards the absence of an intellectual disability.

The PSI also provided details of the numerous disciplinary reports Tuecke had received since incarcerated in 2010.

At the resentencing hearing, the court set aside Tuecke's prior judgment and prison sentence, and it adjudged him guilty of the two counts of second-degree sexual abuse. The court resentenced Tuecke on each count to a term of imprisonment not to exceed twenty-five years, to be served concurrently, and it ordered those sentences to run consecutively to his second-degree-burglary sentence. The court ordered Tuecke to "serve a minimum of [seventy percent] of the sentence before coming eligible for parole," and it imposed a special life sentence requiring he be committed to the custody of the DOC for the rest of his life, as provided by section 903B.1.[1] Thereafter, the court filed a written order consistent with its oral pronouncement at sentencing.

Tuecke now appeals.

## II. Discussion.

On appeal, Tuecke argues the seventy-percent mandatory minimum sentence imposed is disproportionate and constitutes cruel and unusual punishment in violation of the United States Constitution and the Iowa Constitution.[2] He also argues the district court abused its discretion in

---

[1] Though Tuecke received two sentences for his second-degree-sexual-abuse convictions, the sentences were ordered to be served concurrently, so we at times refer to his sentences in the singular.

[2] Tuecke's argument heading in his brief only references the Iowa Constitution. However, his argument and conclusion cite both the Iowa and United States Constitutions. He does not expressly suggest we interpret the Iowa Constitution differently than the Federal Constitution, but his argument centers upon *Lyle*, wherein the majority "follow[ed] the federal analytical framework in deciding [*Lyle*], but ultimately use[d] its] judgment in giving meaning to [Iowa's] prohibition against cruel and unusual punishment in reaching [its] conclusion." *See* 854 N.W.2d at 401-03. This is relevant because, as the dissenters in *Lyle* point out, the holding in *Lyle* under the Iowa Constitution goes beyond the United States Supreme Court's holdings interpreting the similar Federal Cruel and Unusual Punishment Clause. *See id.* at 405 (Waterman, J., dissenting) ("By holding Lyle's seven-year mandatory minimum sentence for his violent felony is cruel and unusual punishment and unconstitutional under article I, section 17 of

sentencing him to the mandatory-minimum term. As a general rule, we review a district court's sentencing decisions for an abuse of discretion. *See State v. Formaro*, 638 N.W.2d 720, 724-25 (Iowa 2002). However, when a defendant challenges the constitutionality of a sentence, our review is de novo. *See State v. Seats*, 865 N.W.2d 545, 553 (Iowa 2015).

### A.  Cruel and Unusual Punishment.

### 1.  Applicable Juvenile-Sentencing Jurisprudence.

Both the U.S. Constitution and the Iowa Constitution prohibit the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII; Iowa Const. art. I, § 17 ("Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted."). Underlying the constitutions' prohibition is the venerable adage "that punishment should fit the crime." *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009). "[T]he right to be free from cruel and unusual punishment flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned to offense.'" *State v. Null*, 836 N.W.2d 41, 57 (Iowa 2013) (citation omitted). However, the right's meaning and interpretation is "not static" but rather ever evolving. *See Lyle*, 854 N.W.2d at 384. Thus, constitutional challenges alleging cruel and unusual punishment must be considered under the current, prevailing

---

the Iowa Constitution, rather than under the Eighth Amendment, the majority evades review by the United States Supreme Court."); *id.* at 408 (Zager, J., dissenting) ("The majority expands article I, section 17 of the Iowa Constitution to a point supported by neither our own caselaw nor by any caselaw of the United States Supreme Court. Neither does such an expansive interpretation find support in the caselaw of any other appellate court in the nation. Contrary to the majority's reasoning, the United States Supreme Court's interpretation of the Federal Constitution does not support this expansive interpretation."). Because Tuecke asks that we follow the court's reasoning in *Lyle*, we only address his claims under the Iowa Constitution.

"standards of whether a punishment is 'excessive' or 'cruel and unusual,'" drawing "meaning from the evolving standards of decency that mark the progress of a maturing society." *Id.*

"Until recently, there were two general classifications of cruel and unusual sentences." *Id.* at 385 (citing *Graham v. Florida*, 560 U.S. 48, 60 (2010)). The first category of claims required a determination of whether a particular defendant's sentence, considering all of the circumstances of the case, is unconstitutionally excessive or grossly disproportionate to the seriousness of the particular crime. *See id.* The second category of claims "contemplated categorical bars to imposition of the death penalty irrespective of idiosyncratic facts." *Id.* However, the claims in this category generally fell under two separate subsets: challenges based upon the nature of the crime by itself, and challenges based upon "characteristics of the offender." *Id.* The Iowa Supreme Court differentiated the two subsets by way of example:

> For instance, no offender can be sentenced to death—regardless of their personal characteristics—if only convicted of a nonhomicide offense and they did not intend to cause the death of another. [*Kennedy v. Louisiana*, 554 U.S. 407, 438 (2008)]. Additionally, a death penalty cannot be imposed, irrespective of the crime, on an intellectually disabled criminal offender, [*Atkins v. Virginia*, 536 U.S. 304, 350 (2002)], or a juvenile offender, [*Roper v. Simmons*, 543 U.S. 551, 578 (2005)].

*Id.*

The United States Supreme Court introduced a third category of challenges in *Graham*, 560 U.S. at 70-74, "blend[ing] its two prior subsets of categorical challenges—consideration of the nature of the crime and consideration of the culpability of the offender." *Lyle*, 854 N.W.2d at 385. In that

case, the sentence at issue—life in prison without parole—followed a juvenile offender's conviction for committing a nonhomicide offense. *See id.* (discussing *Graham*, 560 U.S. at 71). The Court concluded the sentence constituted cruel and unusual punishment, given "the limited culpability of juvenile nonhomicide offenders," the severity of the sentence, and its determination that "penological theory is not adequate to justify life without parole for juvenile nonhomicide offenders." *Graham*, 560 U.S. at 74-75. The Court noted states were not "required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime," but it concluded the prohibition of cruel and unusual punishment under the Federal Constitution *did* require states to "give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," prohibiting the states "from making the judgment at the outset that those offenders never will be fit to reenter society." *Id.* at 75. Stated another way, under the Eighth Amendment, juveniles convicted of nonhomicide offenses must have the *possibility* to be released during their lifetimes. *See id.* "[E]ven if [a defendant] spends the next half century attempting to atone for his crimes and learn from his mistakes," the Eighth Amendment mandates that that defendant be given a "chance to later demonstrate that he is fit to rejoin society based solely on a nonhomicide crime that he committed while he was a child in the eyes of the law." *Id.* at 79.

Thereafter, "the Court in [*Miller v. Alabama*, 132 S. Ct. 2455, 2469 (2012),] held a statutory schema that mandates life imprisonment without the possibility of parole cannot constitutionally be applied to a juvenile." *Lyle*, 854 N.W.2d at 381; *see also Montgomery v. Louisiana*, 136 S. Ct. 718, 725, 734 (2016) (finding its

holding in *Miller*—"that a juvenile convicted of a homicide offense could not be sentenced to life in prison without parole absent consideration of the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing"—applied retroactively). The Iowa Supreme Court subsequently determined the *Miller* rule was retroactive, and it "applied the reasoning in *Miller*" in several cases that followed. *See Lyle*, 854 N.W.2d at 381 (discussing *Null*, 836 N.W.2d at 72; *State v. Pearson*, 836 N.W.2d 88, 96-97 (Iowa 2013); and *State v. Ragland*, 836 N.W.2d 107, 117 (Iowa 2013)). Ultimately, the court held a juvenile offender's sentence that *effectively* deprived the offender "of a meaningful opportunity for early release on parole during the offender's lifetime based on demonstrated maturity and rehabilitation" was cruel and unusual punishment.[3] *Id.* Summarizing its application of *Miller* to these cases, the court noted it found "not just . . . a de facto life sentence or one 'that is the practical equivalent of a life sentence without parole'" to be cruel and unusual, it also found a juvenile offender's sentence of a "lengthy term-of-years" to be cruel and unusual. *Id.* (citations omitted). Notably, in two of the cases, the sentences were found unconstitutional under the Iowa Constitution. *See Null*, 836 N.W.2d at 76; *Pearson*, 836 N.W.2d at 96-98; *but see Ragland*, 836 N.W.2d at 122 (finding "sentence with parole [was] the practical equivalent of a life sentence without parole" and amounted "to cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution").

---

[3] *Lyle*, *Null*, *Pearson*, *Ragland*, and *State v. Seats*, a more recent cruel-and-unusual punishment case, were each decided by a four-to-three vote. *See Seats*, 865 N.W.2d at 558.

A year after deciding *Ragland*, the court considered *Lyle*, premised upon a juvenile offender's cruel-and-unusual-punishment challenge to his sentence of ten years in prison with a mandatory minimum term of seven years for a nonhomicide offense. *See* 854 N.W.2d at 380-81. The court held:

> In the end, we conclude *all mandatory minimum sentences* of imprisonment for youthful offenders are unconstitutional under the cruel and unusual punishment clause in article I, section 17 of our constitution. Mandatory minimum sentences for juveniles are simply too punitive for what we know about juveniles. . . . Additionally, we think the jolt would be compounded once parents would further discover that their child must serve at least seventy percent of the term of the mandatory sentence before becoming eligible for parole. This shock would only intensify when it is remembered how some serious crimes can at times be committed by conduct that appears less serious when the result of juvenile behavior. This case could be an illustration.
>
> . . . .
>
> Ultimately, we hold a mandatory minimum sentencing schema, *like the one contained in section 902.12*, violates article I, section 17 of the Iowa Constitution when applied in cases involving conduct committed by youthful offenders. We agree categorical rules can be imperfect, "but one is necessary here." [*Graham*, 560 U.S. at 75]. We must comply with the spirit of *Miller*, *Null*, and *Pearson*, and to do so requires us to conclude their reasoning applies to even a short sentence that *deprives the district court of discretion* in crafting a punishment that serves the best interests of the child and of society. The keystone of our reasoning is that youth and its attendant circumstances and attributes make a broad statutory declaration denying courts this very discretion categorically repugnant to article I, section 17 of our constitution.

*Id.* at 400-03 (emphasis added) (footnote omitted). Because the sentencing court did not consider the newly established factors or requirements stated in *Miller* or the court's recent cases when it made its sentencing decision, the court vacated Lyle's sentence and remanded the case back to the sentencing court. *See id.* at 401-02. The court directed that the sentencing court determine

whether "the minimum period of incarceration without parole is warranted under the factors identified in *Miller* and further explained in *Null*." *Id.* at 404 n.10.

Yet, the *Lyle* majority clarified that although it was vacating the sentence and remanding, it was not holding "that juvenile offenders cannot be sentenced to imprisonment for their criminal acts" or that "juvenile offenders cannot be sentenced to a minimum term of imprisonment." *Id.* at 380-81. It qualified it was "only hold[ing] juvenile offenders cannot be mandatorily sentenced under a mandatory minimum sentencing scheme." *Id.* at 381. The court also expressly stated its holding did "not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed" or "from *imposing a minimum time that youthful offenders must serve* in prison before being eligible for parole." *Id.* at 403 (emphasis added). In a footnote, it further explained:

> Under article I, section 17 of the Iowa Constitution, the portion of the statutory sentencing schema requiring a juvenile to serve seventy percent of the period of incarceration before parole eligibility may not be imposed *without a prior determination by the district court that the minimum period of incarceration without parole is warranted under the factors identified in* Miller *and further explained in* Null. The factors to be used by the district court to make this determination on resentencing include: (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Id.* at 404 n.10 (emphasis added) (internal citations omitted).

This tributary of the law has not been as crystal clear as a northeast Iowa trout stream, and the Iowa Supreme Court further muddied the waters in 2015. In S*tate v. Louisell*, the court "consider[ed] the nature and extent of a court's discretion in resentencing a juvenile offender convicted of a murder committed in 1987." 865 N.W.2d 590, 592 (Iowa 2015). In that case, Louisell was convicted of first-degree murder, a crime committed when she was seventeen years and five months old, following a jury trial in 1988. *See id.* at 592-94. "[S]he was sentenced to life imprisonment without parole, the only sentence authorized in Iowa Code section 902.1 (1987) for that crime." *Id.* at 593-94 (footnote omitted). In 2011, after the Supreme Court decided *Graham*, Louisell filed a motion to correct her sentence, asserting it was now illegal. *See id.* at 594. Following a series of events, not relevant here, an individualized sentencing hearing was held in district court to resentence Louisell. *See id.* The district court "carefully considered the evidence in the record and thoroughly analyzed each of the *Miller* factors." *See id.* at 595. The court then determined Louisell should be resentenced "to a definite term of twenty-five years with credit for time served, thereby discharging her from prison immediately and releasing her to correctional supervision, as if on parole, for no more than two years." *Id.* However, in the event it was determined the court lacked authority to impose this new, definite term-of-years sentence, "the court imposed an alternative sentence of life in prison with the possibility of parole after twenty-five years." *Id.* The State appealed and requested a stay of the resentencing order, and the supreme court "granted the stay and retained the appeal to clarify the district court's sentencing authority in this evolving area of law." *Id.*

On review, the supreme court found the district court lacked authority to impose its first sentence—a definite term of twenty-five years—because the Iowa Code, at that time, did not authorize "a term-of-years sentence for a defendant convicted of first-degree murder, even if that defendant committed the crime as a juvenile," and it vacated that part of the sentencing court's order. *Id.* at 598. It then discussed its and the Supreme Court's recent juvenile-sentencing jurisprudence. *See id.* at 598-600. Because the existing statutory punishment— prohibiting all offenders from being released on parole if convicted of a class "A" felony—was unconstitutional following *Miller*, *Ragland*, *Null*, and *Pearson*, the court found the sentencing court correctly severed that portion of the sentence in resentencing Louisell. *See id.* at 599. The severance left the following statutory subsection intact, that, "[n]otwithstanding subsection 1 [from which the initial language was severed], a person convicted of a class 'A' felony, and who was under the age of eighteen at the time the offense was committed shall be eligible for parole after serving a minimum term of confinement of twenty-five years." *Id.* (discussing Iowa Code § 902.1(2)(a)(2011)). However, the court also found, under *Lyle*, the portion of the subsection that required serving a mandatory minimum term of confinement violated the Iowa Constitution and also struck that language from the statute. *See id.* at 600 ("Accordingly, *Lyle* requires that the final clause of subsection 902.1(2)(a) providing for a mandatory minimum term of confinement also be severed for purposes of sentencing Louisell."). After severing the statute's unconstitutional parts, it found what remained was that the sentencing "court had discretion to impose a life sentence with eligibility for parole." *Id.* It then vacated the sentencing court's alternative sentence and

remanded "for entry of a sentence of life in prison with eligibility for parole." *Id.* at 601. Once again, the court emphasized in a footnote that *Louisell* only addressed "the scope of the district court's discretion to impose an individualized sentence after considering the *Miller* factors." *Id.* at 601 n.9. It expressly stated it was not deciding "whether the sentence of life in prison with eligibility for parole is in [Louisell's] case disproportionate, illegal, or cruel and unusual under either the Eighth Amendment or article I, section 17 of the Iowa Constitution." *Id.*

The same day it handed down its opinion in *Louisell*, the court also decided *Seats*, 865 N.W.2d at 556. In that case, Seats was convicted of first-degree murder, among other things, for a crime he committed when he was a juvenile, and he challenged his conviction of life without the possibility of parole following the Supreme Court's decision in *Graham*. *Seats,* 865 N.W.2d at 547-49. After a series of events not relevant here, a sentencing hearing was held. *See id.* at 550-51. Thereafter, the sentencing court, having considered the applicable statutory factors and the factors set forth in *Miller*, determined a sentence of life without parole was warranted for Seats. *See id.* at 551-52. "Ultimately, the [sentencing] court granted Seats's motion to correct the illegal sentence '[t]o the extent the previous sentence was imposed without individualized consideration of the circumstances'" and it "'otherwise denied the motion and upheld Seats's sentence of life with parole eligibility after sixty years as commuted by the governor.'" *Id.* at 552 (second alteration in original). The sentencing court "addressed Seats's personal characteristics and potential for reform, using his childhood circumstances, the negative family influences in his

life, and his lack of a stable support system as a factor against him" and the nature of his crime. *Id.*

Seats appealed the sentence, and on further review, the supreme court found the sentencing court "did not consider the factors a court must consider before sentencing a juvenile to life in prison without the possibility of parole," and it vacated the sentence and remanded the case back to the district court. *Id.* at 557. In remanding, the court stated the "question the [sentencing] court must answer at the time of sentencing is whether the juvenile is irreparably corrupt, beyond rehabilitation, and thus unfit ever to reenter society, notwithstanding the juvenile's diminished responsibility and greater capacity for reform that ordinarily distinguishes juveniles from adults." *Id.* at 558.

### 2. *Applicable Intellectual Disability-Sentencing Jurisprudence.*

We add to the equation the Supreme Court's 2002 decision in *Atkins v. Virginia*, which explicitly considered "whether the death penalty should ever be imposed on [an intellectually disabled] criminal." 536 U.S. at 307. The Court explained:

> Those [intellectually disabled] persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against [so diagnosed] defendants.

*Id.* at 306-07. Comparing such offender's "relative culpability" to the "penological purposes served by the death penalty," the court determined intellectually disabled defendants "should be categorically excluded from execution." *Id.* at

317-18. Concerning retribution, the Court found that because "severity of the appropriate punishment necessarily depends on the culpability of the offender . . . an exclusion for the [intellectually disabled] is appropriate." *Id.* at 319. Additionally, culpability was again key to the Court's determination that execution of the intellectually disabled did not serve the penological purpose of deterrence, because "it is the same cognitive and behavioral impairments that make these defendants less morally culpable." *Id.* at 320. "Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' [the Court] therefore conclude[d] that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of an [intellectually disabled] offender." *Id.* at 321 (citation omitted).

*Atkins* has not been extended to include borderline intellectually disabled offenders. *But see Hall v. Florida*, 134 S. Ct. 1986, 1990, 1992 (2014) (finding "Florida law requir[ing] that, as a threshold matter, [a defendant] show an IQ test score of 70 or below" to establish an intellectual disability was unconstitutional because it "create[d] an unacceptable risk that persons with intellectual disability will be executed"). Moreover, lower courts faced with *Atkins*-based challenges by intellectually-disabled offenders have found *Atkins* only applies to those offenders with death penalty sentences. *See, e.g.*, *United States v. Gibbs*, 237 F. App'x 550, 568 (11th Cir. 2007) (finding *Atkins* was inapplicable in the context of a sentence that did not involve the death penalty); *Harris v. McAdory*, 334 F.3d 665, 668 n.1 (7th Cir. 2003) (same); *People v. Brown*, 967 N.E.2d 1004, 1022 (Ill. App. Ct. 2012) (same); *Commonwealth v. Yasipour*, 957 A.2d 734, 744 (Pa. Super. Ct. 2008) (same).

### 3. Application of Jurisprudence to Tuecke.

Tuecke argues that because he was a juvenile and diagnosed with an intellectual disability at the time he committed the sexual offenses, the "mandatory" minimum imposed as part of his new sentence is unconstitutional under the logic and reasoning of *Lyle*. For the following reasons, we disagree.

First and foremost, unlike all of the cases cited above, including *Lyle*, Tuecke's judgment was initially deferred, and no sentence was imposed upon him. *See* Iowa Code § 907.1(1). The purpose of deferred judgments "is to provide an opportunity for rehabilitation and to spare the defendant, particularly a first offender, the burden of a criminal record. Like probation, a deferred judgment is a privilege, where the defendant is the primary beneficiary." 22A C.J.S. *Criminal Law* § 558 (footnote omitted). Additionally, the death penalty is not at issue here, and thus, *Atkins* is inapplicable.

Tuecke was given an opportunity for rehabilitation from the get-go; had he complied with the conditions set by the court, *no sentence* would have been imposed upon him. *See* Iowa Code § 907.1(1). The crux of the cruel-and-unusual-punishment cases where a juvenile's sentence was deemed unconstitutional is that the sentencing court had no discretion to consider relevant mitigating factors, such as the offender's age or possibility for rehabilitation, in fashioning its sentence. *See, e.g., Miller*, 132 S. Ct. at 2460 (holding mandatory life without parole for juveniles was cruel and unusual punishment); *Graham*, 560 U.S. at 82 (holding the United States "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide"); *Lyle*, 854 N.W.2d at 381 ("Pursuant to Iowa

statute, the sentence was mandatory, and [Lyle] was required to serve seventy percent of the prison term before he could be eligible for parole."); *Null*, 836 N.W.2d at 46 ("At Null's sentencing hearing, the court stated that it had no discretion in imposing the fifty-year sentence for second-degree murder or the twenty-five-year sentence for first-degree robbery."); *Pearson*, 836 N.W.2d at 89 ("Because each first-degree robbery conviction carries a sentence of twenty-five years imprisonment subject to a seventy percent mandatory minimum, Pearson received a fifty-year sentence and will be ineligible for parole until she serves thirty-five years."); *Ragland*, 836 N.W.2d at 110 ("The district court then sentenced Ragland to a term of life in prison without parole. The sentence was mandatory under Iowa law.").

Unlike the above-cited cases, the court in this case had discretion initially when it granted Tuecke a deferred judgment, and it explained it elected to defer judgment and sentence after it considered the plea agreement, Tuecke's age, and the nature of the offense. Instead of imposing judgment and sentence, it directed that programming be provided to Tuecke for purposes of rehabilitation. Then, after Tuecke—as an adult—violated his probation agreement in 2009, the court *again* chose to defer Tuecke's judgment and sentence, ordering Tuecke to reside at a residential treatment facility. It did not revoke its deferred judgment and impose a sentence until 2010, when Tuecke *again* violated his probation by committing numerous rule infractions of the residential treatment facility and after Tuecke had committed second-degree burglary. Clearly, the sentencing court gave Tuecke several chances to establish his offenses were committed because he lacked maturity and that he was rehabilitated. Tuecke chose not to abide by

the court's reasonable terms.  Consequently, we do not believe, under the facts of this case, that Tuecke's 2010 sentence constituted cruel and unusual punishment under the Iowa Constitution merely because the offenses were committed when he was a juvenile.

In any event, following Tuecke's motion requesting resentencing under *Lyle*, the court resentenced Tuecke in 2015.  In its colloquy at the sentencing hearing, the judge noted his detailed experience as a juvenile-court judge, as well as his familiarity with Tuecke's sexual-abuse convictions, having served as the judge in all of the prior relevant proceedings.  The court further explained it had considered the factors set forth in *Lyle* in determining whether to re-impose the seventy-percent "mandatory" minimum requirement as part of Tuecke's new sentence, and it determined the requirement should be re-imposed, stating:

> [S]ince day one, the court has imposed the least-restrictive criminal sanctions, the least-onerous criminal sanctions available to Mr. Tuecke with the hope that he would take advantage of those services.
> . . . .
> . . . The court used graduated sanctions and increased those sanctions only based upon his further violations and misconduct, that the court only imposed the sanction of prison and the mandatory minimum sentence as a last resort—after exhausting all of his other efforts and taking into account the services offered to him both by the justice system and his family during the interim.
> And by following that procedure of graduated sanctions, the court considered the difficulty youthful offenders have in these circumstances and their lack of maturity by not immediately imposing the most severe sanction available to the court and giving the defendant the benefit of those opportunities to change his behavior.
> For all of those reasons, the court believes the mandatory minimum seventy-percent requirement should be imposed and the consecutive sentence from the new later burglary charge are all appropriate.

*Lyle* explicitly does not prohibit judges "from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole."[4] 854 N.W.2d at 403. It only requires the sentencing court first determine if "the minimum period of incarceration without parole is warranted under the factors identified in *Miller* and further explained in *Null*" before imposing the time. *Id*. at 404 n.10. There is no question the court did that here. *Cf. State v. McLachlan*, No. 14-0257, 2015 WL 1332336, at *3 (Iowa Ct. App. Mar. 25, 2015). Thus, though the word "mandatory" has been used, it is clear the court used its discretion in considering and then imposing a minimum term of service, as required under *Lyle*. Consequently, the district court's sentences do not violate the Iowa Constitution on its face.

After the district court applies the principles of *Miller* to a defendant's sentence, and we find the sentence is appropriate under *Lyle*, we consider whether the sentence in this case would be cruel and unusual because of gross disproportionality. *See Null*, 836 N.W.2d at 76; *Bruegger*, 773 N.W.2d at 883. Though the basic principles for determining whether a sentence is disproportionate under the Iowa Constitution are the same under the Federal

---

[4] The court's explanation in *Louisell,* 865 N.W.2d at 600,—that, under *Lyle*, "all mandatory minimum sentences for juveniles violate article I, section 17 of the Iowa Constitution,"—appears to be at odds with the following paragraph *Lyle*:

> It is important to be mindful that the holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. Article I, section 17 only prohibits the one-size-fits-all mandatory sentencing for juveniles.

*Lyle*, 854 N.W.2d at 403. However, the court noted in *Louisell* that the only issue before it was "*the scope of the district court's discretion* to impose an individualized sentence after considering the *Miller* factors." *Louisell*, 865 N.W.2d at 601 n.10 (emphasis added). Tuecke does not challenge the district court's authority or the scope of its discretion here, and we consequently do not address it further.

Constitution, our review under our own constitution is more stringent than review under the Federal Constitutional counterpart; our review must not be "toothless." *See Bruegger*, 773 N.W.2d at 883. Nevertheless, it is "rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012). Additionally, "[i]f the sentence does not create an inference of gross disproportionality, then 'no further analysis is necessary.'" *Id.* (citation omitted).

When reviewing a defendant's sentence to determine whether it is "grossly disproportionate" to the offense, we give substantial deference to the legislature and its discretion to enact penalties for certain crimes. *See id.* Generally, the punishments established by the legislature are "regarded as the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual." *Id.* We also consider whether there is a high risk of potential gross proportionality based upon the "unique features" of a case. *See id.* at 651.

Here, there is no doubt Tuecke's age and intellect created a risk of *potential* gross proportionality. Nevertheless, under the case's unique facts, we do not find the imposition of a minimum term of service to be grossly disproportionate to Tuecke's crimes. First, it is questionable whether Tuecke has an intellectual disability, and if so, whether the "mild" disability would fall into the *Atkins* classification of categorically-barred defendants. Additionally, though Tuecke was a juvenile, he was eighteen when he was charged with sexually abusing two children under the age of twelve. He and his parents agreed to have the case moved to district court because it provided the best possible options for

Tuecke's rehabilitation. Tuecke chose to enter into a plea agreement allowing him to be granted a deferred judgment, wherein *no* sentence would have been entered against him if he complied with the terms of his probation. After he turned eighteen, he violated his probation. The court gave Tuecke another chance; yet, he again violated his probation. In fact, while in the residential treatment facility, his behaviors seemed to escalate, and he has since incurred numerous infractions in prison. Ultimately, the reasoning behind *Lyle* is that "our collective sense of humanity preserved in our constitutional prohibition against cruel and unusual punishment and stirred by what we all know about child development demands some assurance that imprisonment is actually appropriate and necessary." 854 N.W.2d at 401. His probation violations and subsequent infractions before the initial sentences were imposed evidence that imprisonment is actually appropriate and necessary. Moreover, Tuecke does not have a life sentence. While a seventeen-and-one-half-year sentence is lengthy, it is what the legislature has determined to be appropriate. After reviewing Tuecke's case and comparing the gravity of his crime to the penalty mandated by the statute, we do not find the minimum term of service imposed by the district court in resentencing Tuecke leads to an inference of gross disproportionality. Since the penalty does not lead to an inference of gross disproportionality, the sentence is not cruel or unusual punishment, and we need not continue the analysis.

### B. Abuse of Discretion.

Tuecke next argues the court abused its discretion when it determined the seventy-percent time-served requirement be imposed as part of his sentences. He argues the requirement is unreasonable, given the facts of the case. "An

abuse of discretion will only be found when a court acts on grounds clearly untenable or to an extent clearly unreasonable." *State v. Hopkins*, 860 N.W.2d 550, 553 (Iowa 2015). "When a sentence imposed by a district court falls within the statutory parameters, we presume it is valid and only overturn for an abuse of discretion or reliance on inappropriate factors." *Id.* at 554. Importantly, "we do not decide the sentence we would have imposed, but whether the sentence imposed was unreasonable." *Id.* In exercising its discretion, the court should "consider all pertinent matters in determining [the] proper sentence, including the nature of the offense, the attending circumstances, defendant's age, character and propensities and chances of his reform." *Null*, 836 N.W.2d at 87. Again, the "punishment should fit both the crime and the individual," though the court owes a duty to the public as much as it owes to the offender in determining the sentence. *See id.*

Here, the district court considered all of the pertinent factors in determining Tuecke's sentences, including its decision to impose the minimum-term-of-service requirement. It carefully weighed the aggravating and mitigating circumstances in Tuecke's case, including Tuecke's failure to follow the terms of his probation twice. Tuecke's behaviors evidenced he was a threat to the community. Upon our review, we find the imposition of a minimum term of service as part of Tuecke's corrected sentences was reasonable under all of facts and circumstances of the case. Consequently, we conclude the sentencing court did not abuse its discretion.

***III. Conclusion.***

The district court's decision to impose the minimum term of service requirement as part of Tuecke's corrected sentences did not constitute cruel and unusual punishment under the Iowa Constitution. Additionally, the imposition of a minimum term of service as part of Tuecke's corrected sentences was reasonable under all of the facts and circumstances of the case and not an abuse of discretion. Accordingly, we affirm Tuecke's sentences.

**AFFIRMED.**