# IN THE SUPREME COURT OF IOWA

No. 15–0235

Filed May 25, 2017

**STATE OF IOWA,**

> Appellee,

vs.

**SAYVON ANDRE PROPPS,**

> Appellant.

On review from the Iowa Court of Appeals.

Certiorari to the Iowa District Court for Polk County, Richard G. Blane II, Judge.

A juvenile challenges his sentence as unconstitutional under the Iowa Constitution. **DECISION OF COURT OF APPEALS VACATED; WRIT ANNULLED.**

Amy Pellegrin (until withdrawal) and Gregory T. Racette of Hopkins & Huebner, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis Sloven, Assistant Attorney General, for appellee.

**ZAGER, Justice.**

A juvenile was sentenced to four consecutive, indeterminate sentences of ten years in prison for four counts of willful injury causing serious injury. No mandatory minimum sentence was imposed. However, because the crime of willful injury causing serious injury is a forcible felony, the sentencing judge was unable to consider a deferred judgment or probation as a sentencing option. The juvenile now challenges, by means of a motion to correct an illegal sentence, the forcible felony sentencing statute under the Iowa Constitution. He argues that the mandatory nature of the prison sentence is unconstitutional given the Iowa Constitution and our precedents in the area of juvenile sentencing. For the reasons set forth below, we find that Iowa Code section 907.3 is not unconstitutional under the Iowa Constitution as applied to juvenile offenders. We vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

On February 27, 2011, Derek Carr was standing outside his home when Troy Lee Mure Jr. drove up in a vehicle in which Sayvon Propps was a passenger. Propps exited the vehicle, fired four shots into Carr, and got back in the vehicle. Mure immediately drove away from the scene. Carr was hit in his back, buttocks, and leg. He was transported to the hospital where he remained hospitalized for three weeks before he was discharged. Propps was seventeen years of age at the time of the crime.

On April 20, the State charged Propps with attempted murder in violation of Iowa Code section 707.11 (2011). Propps entered into a plea agreement with the State whereby he agreed to plead guilty to four counts of the lesser charge of willful injury causing serious injury. The

State then amended the trial information to charge Propps with four counts of willful injury causing serious injury in violation of Iowa Code section 708.4(1). Because willful injury causing serious injury is a forcible felony, probation is not an option under Iowa law. *See* Iowa Code § 702.11(1); *id.* § 907.3.[1]

Pursuant to the plea agreement, the district court sentenced Propps to indeterminate sentences not to exceed ten years on each of the four counts. The district court ordered each of the sentences to run consecutively to the others for a maximum sentence of forty years. There were no mandatory minimum sentences of incarceration associated with any charge, and no individualized sentencing hearing was conducted.

On July 31, 2014, Propps filed a motion to correct an illegal sentence. Propps argued that, based on recent federal and state caselaw, the sentence imposed constituted cruel and unusual punishment under the Iowa Constitution. Further, Propps argued that the district court was required to conduct an individualized sentencing hearing even though his sentence contained no mandatory minimum period of incarceration. Propps takes this position due to the evolution of our law surrounding the sentencing of juveniles. The State resisted the motion, claiming that Propps did not receive an illegal sentence in this case. The district court denied the motion, reasoning,

> As the State points out, the crime—Willful Injury—to which the Defendant pled and was sentenced, does not implicate a mandatory minimum sentence. Since the Defendant is eligible for parole and may be released at any time, the sentences, whether consecutive or concurrent, are not cruel

---

[1]In pertinent part, section 901.5 provides the standards for when a district court may impose a deferred judgment, deferred sentence, or suspended sentence. Iowa Code § 901.5. However, in the case of a forcible felony, the section does not apply. *Id.* § 907.3.

and unusual, do not violate the federal or state constitutions, are therefore not illegal and Defendant is not entitled to a correction of his sentence or resentencing.

Propps appealed the decision of the district court, and we transferred the case to the court of appeals.

On appeal, Propps argued that "all juveniles, especially those who have been sentenced to a lengthy term of years, must undergo an individualized sentencing hearing regardless of whether or not the sentence has a mandatory term of years." He asserted that individualized sentencing applied because, as with mandatory minimums, the district court had no choice but to sentence him to a term of imprisonment. The court of appeals affirmed the district court's denial of Propps's motion to correct an illegal sentence. Propps appealed, and we granted further review.

## II.  Jurisdictional Argument.

The State raises the issue of whether we have jurisdiction to hear this appeal. Since the district court ruling is on a motion to correct an illegal sentence, the State argues that Propps cannot appeal the denial of his motion to correct an illegal sentence because the ruling denying such a motion is not a "final judgment of sentence" under Iowa Code section 814.6(1). We requested supplemental briefing to address this preliminary issue.

Subject-matter jurisdiction over a claim is conferred either constitutionally or statutorily. *De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 164 (Iowa 2016). Iowa Rule of Appellate Procedure 6.103(1) provides that "[a]ll final orders and judgments of the district court involving the merits or materially affecting the final decision may be appealed to the supreme court, except as provided in this rule, rule

6.105, and Iowa Code sections 814.5 and 814.6." Iowa R. App. P. 6.103(1).[2]

Iowa Code section 814.6 contains the standards for subject-matter jurisdiction for the review of a criminal defendant's appeal. Iowa Code § 814.6. Pertinent to this case, a criminal defendant has the "right of appeal" from "[a] final judgment of sentence." *Id.* A previous version of the statute provided that "[a]n appeal can only be taken from the final judgment, and within sixty days thereafter." Iowa Code § 793.2 (1954). The statute was thereafter amended to include the clarifying language "judgment *of sentence.*" Iowa Code § 814.6 (1983) (emphasis added). This language continues today. *See* Iowa Code § 814.6(1)(*a*) (2017).

This is consistent with the general rule that the "[f]inal judgment in a criminal case means sentence." *Daughenbaugh v. State*, 805 N.W.2d 591, 595 (Iowa 2011) (quoting *Burton v. Stewart*, 549 U.S. 147, 156, 127 S. Ct. 793, 798 (2007)); *see also State v. Loye*, 670 N.W.2d 141, 146 (Iowa 2003). "In criminal cases, as well as civil, the judgment is final for the purpose of appeal 'when it terminates the litigation between the parties on the merits' and 'leaves nothing to be done but to enforce by execution what has been determined.' " *State v. Aumann*, 236 N.W.2d 320, 321–22 (Iowa 1975) (quoting *State v. Klinger*, 259 Iowa 381, 383, 144 N.W.2d 150, 151 (1966)). In contrast, "decisions, opinions, findings, or verdicts do not constitute a judgment or decree." *Iowa W. Racing Ass'n v. Iowa Racing & Gaming Comm'n*, 578 N.W.2d 663, 664 (Iowa

---

[2]Iowa Code section 814.5 provides the rules for the right of appeal when the State is the appellant or applicant. Iowa Code § 814.5. Rule 6.105 provides the rules for appeals tried as small claims actions. Iowa R. App. P. 6.105. Neither section is pertinent to our analysis of this case, and we confine our discussion to section 814.6.

1998) (quoting *Wilson v. Corbin*, 241 Iowa 226, 228, 40 N.W.2d 472, 474 (1950)).

The final sentencing order in this case was entered on August 16, 2011. Propps brought a motion to correct an illegal sentence on July 31, 2014, and the district court denied the motion on January 13, 2015. In the ruling denying Propps's motion, the district court neither disturbed the underlying sentence nor entered a new judgment of sentence. An appeal as of right under Iowa Code section 814.6(1)(*a*) on the grounds of appealing a "final judgment of sentence" was improper in this case. The final judgment of sentence occurred three years prior. However, this does not resolve the jurisdictional issue here.

A criminal defendant may challenge an illegal sentence at any time under Iowa Rule of Criminal Procedure 2.24. Iowa R. Crim. P. 2.24(5)(*a*); *see also State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009). A defendant may appeal the denial of a motion to correct an illegal sentence by applying for discretionary review under either Iowa Code section 814.6(2)(*e*) or Iowa Rule of Appellate Procedure 6.106. Iowa Code § 814.6(2)(*e*) (allowing discretionary review of "[a]n order raising a question of law important to the judiciary and the profession"); Iowa R. App. P. 6.106 ("An application for discretionary review may be filed to review certain orders specified by statute which are not subject to appeal as a matter of right."). A defendant may also appeal the denial of a motion to correct an illegal sentence by petition for writ of certiorari under Iowa Rule of Appellate Procedure 6.107. Iowa R. App. P. 6.107(1)(*a*) ("Any party claiming a district court judge . . . exceeded the judge's jurisdiction or otherwise acted illegally may commence an original certiorari action in the supreme court by filing a petition for writ of certiorari."). Because section 814.6(1)(*a*) does not apply to a defendant's

motion to correct an illegal sentence, one of these actions would have been the proper method for bringing such a challenge.

However, a "court has inherent power to determine whether it has jurisdiction over the subject matter of the proceedings before it." *Klinge v. Bentien*, 725 N.W.2d 13, 15 (Iowa 2006) (quoting *Tigges v. City of Ames*, 356 N.W.2d 503, 512 (Iowa 1984)). Discretionary review is available under section 814.6 to orders "raising a question of law important to the judiciary and the profession." Iowa Code § 814.6(2)(*e*). Additionally, if a case is initiated by a notice of appeal, but another form of review is proper, we may choose to proceed as though the proper form of review was requested by the defendant rather than dismiss the action. Iowa R. App. P. 6.108. Accordingly, we will treat Propps's notice of appeal and accompanying briefs as a petition for writ of certiorari, as we conclude that appeals from a motion to correct an illegal sentence are most appropriately fashioned in this manner. We grant the petition for writ of certiorari.

### III. Standard of Review.

An unconstitutional sentence is an illegal sentence, and therefore may be corrected at any time. *State v. Lyle*, 854 N.W.2d 378, 382 (Iowa 2014); *see also* Iowa R. Crim. P. 2.24(5)(*a*). While we ordinarily review challenges to illegal sentences for correction of legal errors, our standard of review for an allegation of an unconstitutional sentence is de novo. *Lyle*, 854 N.W.2d at 382.

### IV. Analysis.

**A. Indeterminate Sentencing and Parole.** A determinate sentence imposes a specific number of years of imprisonment on a defendant, while an indeterminate sentence is one in which the legislature has set a range of the minimum and maximum amount of

years deemed appropriate for the crime. *See, e.g.*, 6 Wayne R. LaFave et al., *Criminal Procedure* § 26.1(c) (2016). Indeterminate sentences are parole eligible, while determinate sentences are not. *Id.* In this case, the district court sentenced Propps to four indeterminate sentences with no mandatory minimum sentence, making Propps immediately eligible for parole.

Once an incarcerated individual is eligible for parole, the Iowa Board of Parole is required to hold yearly file reviews. Iowa Code § 906.5(1)(*a*); *see also* Iowa Board of Parole, FAQ/Information, http://www.bop.state.ia.us/BoardFaq (last visited Mar. 20, 2017) (stating the board of parole is required to hold yearly reviews for every eligible offender) [hereinafter Iowa Board of Parole, FAQ/Information].

When the board of parole reviews a file, it may choose to give the offender work release, deny release, or set up an interview. Iowa Code § 906.3, .5. If the board sets up an interview, it uses the interview to determine whether the individual offender should be released to the community under parole supervision for the remainder of the sentence. *Id.* When making the decision to release an inmate on parole, the board considers a number of factors, including

- *a.* Previous criminal record;
- *b.* Nature and circumstances of the offense;
- *c.* Recidivism record;
- *d.* Convictions or behavior indicating a propensity for violence;
- *e.* Participation in institutional programs, including academic and vocational training;
- *f.* Psychiatric and psychological evaluations;
- *g.* Length of time served;
- *h.* Evidence of serious or habitual institutional misconduct;
- *i.* Success or failure while on probation;
- *j.* Prior parole or work release history;

*k.* Prior refusal to accept parole or work release;

*l.* History of drug or alcohol use;

*m.* A parole plan formulated by the inmate;

*n.* General attitude and behavior while incarcerated;

*o.* Risk assessment.

Iowa Admin. Code r. 205—8.10.

This is consistent with the provisions of Iowa Code section 906.5(3), which provides that

> the board shall consider all pertinent information regarding the person, including the circumstances of the person's offense, any presentence report which is available, the previous social history and criminal record of the person, the person's conduct, work, and attitude in prison, and the reports of physical and mental examinations that have been made.

Iowa Code § 906.5(3).

**B. Cruel and Unusual Punishment and Juvenile Sentencing.** Both the United States Constitution and the Iowa Constitution prohibit cruel and unusual punishment. U.S. Const. amend. VIII; Iowa Const. art. I, § 17. In recent years, both the United States Supreme Court and this court have addressed whether certain juvenile sentencing practices violate the prohibition against cruel and unusual punishment.

The Eighth Amendment right to be free from cruel and unusual punishment "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." *Miller v. Alabama,* 567 U.S. 460, ___, 132 S. Ct. 2455, 2463, (2012) (quoting *Roper v. Simmons,* 543 U.S. 551, 560, 125 S. Ct. 1183, 1190, (2005)). Proportionality is key in an Eighth Amendment analysis, and we view proportionality according to "the evolving standards of decency that mark the progress of a maturing society." *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976)).

In 2005, the Supreme Court held in *Roper* that the sentence of capital punishment when imposed upon a juvenile violates the prohibition on cruel and unusual punishment contained in the Eighth Amendment. 543 U.S. at 560, 126 S. Ct. 1190. In 2010, the Supreme Court held in *Graham v. Florida* that the Eighth Amendment prohibits the imposition of a sentence of life without the possibility of parole for juveniles convicted of nonhomicide offenses. 560 U.S. 48, 74, 130 S. Ct. 2011, 2030 (2010). Finally, in 2012, the Supreme Court held in *Miller* that mandatory sentences of life without the possibility of parole when imposed on juveniles violate the Eighth Amendment. 567 U.S. at \_\_\_, 132 S. Ct. at 2475. *Miller* requires a sentencing court to make individualized sentencing decisions that take into consideration an offender's age and age-related characteristics before imposing "the harshest possible penalty for juveniles" of a life sentence without the possibility of parole. *Id.*

Following the *Miller* decision, Governor Branstad commuted the sentences of all juveniles in Iowa serving mandatory life-without-parole sentences to sentences of sixty years without parole and with no credit for earned time. *See State v. Ragland*, 836 N.W.2d 107, 110 (Iowa 2013). We then heard a trio of cases that considered both the *Miller* case and the cruel and unusual punishment clause of the Iowa Constitution.

In *Ragland*, we held that *Miller* applied retroactively. *Id.* at 117. We then went on to hold that the governor's commutation had the same effect as a life sentence without the possibility of parole, and therefore the *Miller* requirement of individualized sentencing applied. *Id.* at 119, 122. In determining that *Miller* applied to the commuted sentences, we noted that

> the original sentence imposed on Ragland by the district court was a mandatory sentence. The sentencing court had no other option but to impose the one sentence provided by law. This result is important in the analysis because it goes to the heart of *Miller*, which states that "children are constitutionally different from adults for purposes of sentencing," and a mandatory life sentence without parole imposed on juveniles means young offenders "die in prison even if [the sentencing judge] would have thought that his youth and its attendant characteristics . . . made a lesser sentence . . . more appropriate." Importantly, the mandatory penalty component totally precludes the sentencing court from taking the critical aspects of youth into account in the imposition of a sentence.

*Id.* at 119 (quoting *Miller*, 567 U.S. at ___, ___, 132 S. Ct. at 2460, 2464). The commutation did not cure the absence of an individualized sentencing hearing because "*Miller* protects youth at the time of sentencing." *Id.*

In *State v. Null*, we considered the cruel and unusual punishment clause of the Iowa Constitution. 836 N.W.2d 41, 70 (Iowa 2013); *see also* Iowa Const. art. I, § 17. We held that a lengthy term-of-years sentence—in this case a 52.5 year sentence—triggered the protections of a *Miller* individualized sentencing hearing. *Null*, 836 N.W.2d at 71. We reasoned that "geriatric release" after a lengthy term-of-years sentence does not provide a juvenile a meaningful opportunity to demonstrate their maturity and rehabilitation. *Id.* Similarly, in *State v. Pearson*, we held that a minimum sentence of thirty-five years triggered a *Miller* individualized sentencing hearing. 836 N.W.2d 88, 96 (Iowa 2013).

After the *Ragland—Null—Pearson* trio, we went on to consider juvenile sentencing under the Iowa Constitution in a number of other cases. In *Lyle*, we held that all mandatory minimum sentences of imprisonment for juveniles are unconstitutional under article I, section 17 of the Iowa Constitution. 854 N.W.2d at 400. We also summarized the background of change in the area of juvenile sentencing reform and

touched on the topic of parole briefly. *Id.* at 399–400. We noted that the United States Supreme Court has recognized that the opportunity for parole lessens the severity of a sentence. *Id.* at 399; *see also Rummel v. Estelle*, 445 U.S. 263, 280–81, 100 S. Ct. 1133, 1142–43 (1980) (recognizing the opportunity for parole, "however slim," mollifies the severity of the sentence). We ultimately concluded that the "heart of the constitutional infirmity with the punishment imposed in *Miller* was its mandatory imposition, not the length of the sentence." *Lyle,* 854 N.W.2d at 401. We confirmed that the Iowa Constitution applied to mandatory sentences of prison without the opportunity for parole, regardless of the length of the sentence. *Id.*

> [I]f mandatory sentencing for the most serious crimes that impose the most serious punishment of life in prison without parole violates article I, section 17, so would mandatory sentences for less serious crimes imposing the less serious punishment of a minimum period of time in prison without parole.

*Id.*

In *State v. Louisell,* we addressed the question of whether Louisell truly had a "meaningful opportunity for parole" during resentencing or whether her eligibility for parole was simply illusory. 865 N.W.2d 590, 601 (Iowa 2015). Louisell argued that, even with a sentence of life with the possibility of parole, her parole eligibility was illusory because only one of Iowa's thirty-eight juvenile offenders originally sentenced to life without parole had actually been granted parole by the time of her resentencing. *Id.* This single inmate was granted parole on conditional release to hospice care for cancer treatment, and the parole board specifically reserved the right to reconsider its decision if her health improved. *Id.* We declined to address the question of whether Louisell had been wrongfully denied parole. *Id.* at 602. However, we did take the

opportunity to "reaffirm that under both the United States Constitution and the Iowa Constitution, juveniles convicted of crimes must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation'—if a sentencing judge, exercising discretion, determines parole should be available." *Id.* (quoting *Graham,* 560 U.S. at 75, 130 S. Ct. at 2030). We also noted that the factors utilized by the parole board to determine parole eligibility do not "account for the mitigating attributes of youth that are constitutionally required sentencing considerations." *Id.*

In *State v. Seats,* we expanded on our previous cases to clarify the factors a district court should consider when faced with a case in which it had the discretion to sentence a juvenile to life in prison without the possibility of parole. 865 N.W.2d 545, 556–57 (Iowa 2015). Finally, we recently categorically banned the imposition of life-without-parole sentences for juveniles in *State v. Sweet,* 879 N.W.2d 811, 839 (Iowa 2016). We noted that part of the justification for the categorical ban on juvenile life-without-parole sentences is that the *Miller* individualized sentencing hearing is insufficient in that context since "we are asking the sentencer to do the impossible, namely, to determine whether the offender is 'irretrievably corrupt' at a time when even trained professionals with years of clinical experience would not attempt to make such a determination." *Id.* at 837. We found that it was the *parole board* that was best situated to discern which offenders are irreparably corrupt and which have benefited from opportunities for maturation and rehabilitation. *Id.* at 839.

**C. Application to the Present Case.** Propps argues that Iowa's forcible felony sentencing provision is unconstitutional because it does not allow the sentencing judge the option of probation and therefore,

mandates a prison sentence, however short, for juveniles.  *See* Iowa Code § 907.3 (2011).[3]    Although the sentencing statute allows for indeterminate sentences, Propps argues that the sentencing structure does not allow the sentencing judge to "consider the mitigating factors of the offender, specifically a juvenile offender, upon conviction of this crime."

Propps seeks to expand *Lyle* to cases such as his, even though he has no mandatory minimum period of incarceration and he is immediately eligible for parole.  We decline to do so.  Completely eliminating the mandatory imposition of a prison term, even when the term is indeterminate and the individual is immediately eligible for parole, would not serve the proportionality concept we have addressed in our previous juvenile sentencing cases.  In those cases, we sought to eliminate the mandatory nature of mandatory minimums and sentences that were the functional equivalent of life without parole because those sentences did not offer juveniles a "meaningful opportunity" to demonstrate their rehabilitation before the parole board.  *See, e.g.*, *Lyle*, 854 N.W.2d at 402–03; *Null*, 836 N.W.2d at 75; *Pearson*, 836 N.W.2d at 97; *Ragland*, 836 N.W.2d at 121.  Our goal was not to excuse the

---

[3]In 2013, the legislature adopted the following provision:

> 14.  Notwithstanding any provision in section 907.3 or any other provision of law prescribing a mandatory minimum sentence for the offense, if the defendant, other than a child being prosecuted as a youthful offender, is guilty of a public offense other than a class "A" felony, and was under the age of eighteen at the time the offense was committed, the court may suspend the sentence in whole or in part, including any mandatory minimum sentence, or with the consent of the defendant, defer judgment or sentence, and place the defendant on probation upon such conditions as the court may require.

Iowa Acts ch. 42, § 14 (codified at Iowa Code § 901.5(14) (2014)).  Propps does not argue that this provision applies to his resentencing.

behavior of juveniles, but rather to impose punishment in a way that was consistent with the lesser culpability and greater capacity for change of juvenile offenders. *Lyle*, 854 N.W.2d at 398, 402–03; *Null*, 836 N.W.2d at 75 ("[W]hile youth is a mitigating factor in sentencing, it is not an excuse."). We were concerned that offering "geriatric release" or the geriatric opportunity for parole was not consistent with the concept of proportionality. *Null*, 836 N.W.2d at 71.

This is in stark contrast to the situation presented here. In this case, Propps was immediately eligible for parole and able to demonstrate by his own actions his maturation and rehabilitation. When a one-size-fits-all mandatory minimum is imposed, an arbitrary amount of time spent in prison dictates when a juvenile will be released. *See, e.g.*, *Ragland*, 836 N.W.2d at 122. In contrast, when an indeterminate sentence is given that contains no mandatory minimum sentence and allows a juvenile to be immediately eligible for parole, the juvenile defendant's behavior in prison dictates when parole will be available—with the potential for immediate parole if rehabilitation, maturity, and reform have been demonstrated. *See, e.g.*, *Louisell*, 865 N.W.2d at 601.

It is true that immediate *eligibility* for parole is not the same as immediately coming before the parole board for review. *See* Iowa Code § 906.5(1). We require the board of parole to review the status of individuals eligible for parole on an annual basis. *Id.* However, in our juvenile sentencing cases, we have never required that release on parole be *immediate*. *See, e.g.*, *Louisell*, 865 N.W.2d at 602 (establishing that the opportunity for parole need only be realistic and meaningful). We have instead required that juvenile defendants must be given a realistic and meaningful opportunity to demonstrate maturity and rehabilitation—if a sentencing judge, exercising discretion, determines

parole should be available. *Id.* at 601. Propps' immediate eligibility for parole, upon the parameters outlined in section 906.5, is both realistic and meaningful.

The analysis undertaken by the parole board for parole eligibility is an individualized analysis that considers the juvenile's past, in addition to current psychiatric and psychological evaluations, the time already served on the sentence, any reports of misconduct or good behavior, and the inmate's attitude and behavior while incarcerated. *See* Iowa Code § 906.5(3). We noted in *Louisell* that the factors utilized by the parole board to determine parole eligibility may not "account for the mitigating attributes of youth that are constitutionally required sentencing considerations." 865 N.W.2d at 602. However, more recently, we noted that the *Miller* individualized sentencing hearings are insufficient in the context of life-without-parole sentencing. *Sweet*, 879 N.W.2d at 837 ("[W]e are asking the sentencer to do the impossible, namely, to determine whether the offender is 'irretrievably corrupt' at a time when even trained professionals with years of clinical experience would not attempt to make such a determination."). In our most recent case, *Sweet*, we found that the parole board was best situated to discern which juvenile homicide offenders have benefited from opportunities for maturation and rehabilitation. *Id.* at 839. The parole board has the benefit of seeing the individual offender's actual behavior, rather than having to attempt to predict chances at maturity and rehabilitation based on speculation.

Further, allowing a sentencing judge to grant a suspended sentence for a forcible felony may not further the purpose of rehabilitation. While juveniles may be more prone to reform and rehabilitation because of their age and the attendant characteristics of

youth, they must also understand the severity of their actions. *See Lyle*, 854 N.W.2d at 398–99. Harm to a victim is not lessened because of the young age of an offender, and "[t]he constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today." *Id.* at 398. Allowing a sentence of merely probation for forcible felonies may excuse the criminal behavior of the juvenile offender and disproportionately weigh this equation to *only* consider the age and culpability of the offender without the harm he or she caused to a victim. Because an indeterminate sentence allows for immediate eligibility for parole, a juvenile is able to demonstrate to the parole board whether he or she appreciated the harm done and utilized the options available for reform. If rehabilitation has not yet occurred, the parole board may make the decision to continue incarceration until the juvenile has demonstrated through his or her own actions the ability to appreciate the severity of the crime. This is consistent with the approach of our prior holdings in the area of juvenile sentencing, because it allows for a realistic and meaningful opportunity for parole upon the juvenile's demonstration of maturity and rehabilitation. We find that there is no constitutional infirmity in Iowa Code section 907.3. This provision does not violate the Iowa Constitution under a cruel and unusual punishment analysis.

**D. Gross Disproportionality.** Having determined that the sentence for willful injury survives a categorical challenge, we now turn to Propps's claim that the sentence is unconstitutional as applied to him, which we analyze for gross disproportionality. *See, e.g., State v. Oliver*, 812 N.W.2d 636, 647 (Iowa 2012). In his brief in support of his motion to correct an illegal sentence, Propps did not specifically distinguish between the argument that his sentence was grossly disproportionate as

applied to him and the argument that the sentencing structure was categorically unconstitutional. The district court decided the case on a categorical basis and did not address the question of gross disproportionality. On appeal, Propps argued his sentence was unconstitutional as applied to him, and the court of appeals considered and rejected the argument.

While we generally do not decide cases based on grounds not raised in the district court, in *Bruegger* we allowed a defendant to continue with an as-applied challenge when his brief did not clearly distinguish between a categorical or as-applied attack on his sentence. 773 N.W.2d at 884. Because Propps's brief was likewise unclear, we will continue with the analysis under an as-applied framework.

When we determine whether a sentence is grossly disproportionate to an offender's crime, we utilize a three-step analysis. *Oliver*, 812 N.W.2d at 647. The first step in this analysis is a threshold question, and if the first step is not satisfied, we need not proceed to steps two and three. *Id.* Our first step is to determine whether Propps's sentence leads to the inference that it was grossly disproportionate. *Id.* "This preliminary test involves a balancing of the gravity of the crime against the severity of the sentence." *Id.* (quoting *Bruegger*, 773 N.W.2d at 873). Step two requires an intrajurisdictional analysis in which we "compar[e] the challenged sentence to sentences for other crimes within the jurisdiction." *Id.* Step three requires an interjurisdictional analysis, and we "compar[e] sentences in other jurisdictions for the same or similar crimes." *Id.*

We now turn to the threshold inquiry to determine whether Propps's sentence leads to an inference of gross disproportionality to his crime. When we consider this first step, we have established a few

general principles to guide our analysis. *Id.* at 650. First, we give substantial deference to the legislature when it establishes punishments for certain crimes. *Id.* Second, "it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Id.* Third, a recidivist offender is more culpable than a first-time offender and therefore more deserving of a longer sentence. *Id.* Last, a case can have unique feature that may "converge to generate a high risk of potential gross disproportionality" and so we must consider the unique facts of the case. *Id.* (quoting *Bruegger*, 773 N.W.2d at 884).

In this case, Propps's challenge to his sentence is not the rare sentence that survives the first step of our analysis. Propps was sentenced to four indeterminate sentences not to exceed ten years each for four counts of willful injury causing serious injury, and he was immediately eligible for parole. The legislature has determined that there are certain crimes that are so severe that a defendant should not be eligible for a sentence of probation. *See* Iowa Code § 907.3. Forcible felonies such as willful injury causing serious injury are among those crimes the legislature has deemed severe. *Id.* § 702.11(1); *id.* § 708.4(1); *id.* § 907.3. We give deference to the legislature's determination that these crimes are more deserving of sentences of incarceration rather than probation. Additionally, the gravity of Propps's crime was high. Propps fired four shots at his victim and fled the scene. His actions required a lengthy hospital stay for Carr. In contrast, his sentence was not severe. Propps was sentenced to four indeterminate sentences, making him immediately eligible for parole review. The gravity of Propps's crime was high, and the severity of his sentence was low. *See, e.g., Oliver*, 812 N.W.2d at 647. This was not the rare case that satisfies

our threshold inquiry and requires us to continue to steps two and three of the analysis. We hold that Propps's sentence was not unconstitutional under a gross disproportionality analysis.

**E. *Miller* Hearing.** Because we determine that the sentence Propps received is not categorically unconstitutional, and thus there is no constitutional infirmity with the statute, we decline to extend the requirement of a *Miller* individualized sentencing hearing to juvenile defendants who are not subject to a mandatory minimum period of incarceration. Propps is therefore not entitled to a *Miller* individualized sentencing hearing. He has received a meaningful, reasonable, and immediate opportunity for parole, which is all that is required under our decision in *Lyle* and the United States and Iowa Constitutions.

**V. Conclusion.**

We hold that the forcible felony sentencing statute, Iowa Code section 907.3, is not unconstitutional as applied to juvenile offenders. Additionally, in considering a motion to correct an illegal sentence, the district court is not required to conduct a *Miller* individualized sentencing hearing. We therefore annul the writ.

**DECISION OF COURT OF APPEALS VACATED; WRIT ANNULLED.**

Waterman and Mansfield, JJ., join this opinion. Cady, C.J., files a concurring opinion in which Wiggins, J., joins. Appel, J., files a dissenting opinion in which Hecht, J., joins.

**CADY**, **Chief Justice (concurring specially).**

I concur in the result reached by the majority.

We have taken important steps in recent years to recognize constitutional protections in the sentencing of juvenile offenders. While the nature of some criminal acts committed by juveniles can be indistinguishable to those of adults and can challenge faith in humanity just the same, the scientific understanding of the human brain has evolved to give greater shape to the constitutional prohibition against cruel and unusual punishment. *See State v. Null*, 836 N.W.2d 41, 54 (Iowa 2013) ("[D]evelopments in social psychology and neuroscience have reinforced traditional notions that juveniles and adults are, in fact, quite different."). This constitutional standard now sees juveniles as less culpable than adults and recognizes their significantly greater capacity for rehabilitation. *Id.* at 74–75. Juveniles are less culpable because they lack maturity and a sense of responsibility, are more prone to impulsive behavior, and are more vulnerable to negative influences. *See State v. Lyle*, 854 N.W.2d 378, 393, 398 (Iowa 2014) ("[T]he time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed."). Personality traits of juveniles are less fixed than adults, and this difference gives juvenile offenders a greater chance for reform. *See id.* at 400 ("Given the juvenile's greater capacity for growth and reform, it is likely a juvenile can rehabilitate faster if given the appropriate opportunity."). With this understanding, the penological justifications for a fixed mandatory sentence of imprisonment collapse and our constitution demands that we judge juveniles by a different sentencing process than adults.

If the sentencing protections we have recognized for juvenile offenders under our Iowa Constitution were derived solely from their diminished culpability, my view would be more aligned with the dissent in this case. But scientific evidence of lesser culpability is not the single driving force behind our new protections. The constitutional protections we have recognized do not target mandatory incarceration of juvenile offenders, but mandatory incarceration of juvenile offenders with no opportunity during the period of incarceration to show the greater likelihood of rehabilitation and reform has occurred. *Id.* at 403 ("A statute that sends all juvenile offenders to prison *for a minimum period of time* under all circumstances simply cannot satisfy the standards of decency and fairness embedded in article I, section 17 of the Iowa Constitution." (Emphasis added.)). The cruel and unusual punishment that is mandatory minimum sentencing of juveniles lies in the total failure to account for the underdeveloped brain of a juvenile. It lies in treating a juvenile like an adult. But the brain development of a juvenile is a process tied to the passage of time, often years. *See State v. Sweet,* 879 N.W.2d 811, 838 (Iowa 2016) ("Social science suggests reliable answers to these questions come only with the benefit of time and completion of brain development."). Thus, the constitutional protection plays out within the process of parole, not probation. It plays out in our constitutional standard of cruel and unusual punishment, not only because of juveniles' diminished culpability, but also because of personality changes that accompany their maturity with adulthood. The constitutional standard relies on time for this rehabilitation to occur. It requires only an opportunity for these changes to be considered as directed by the advancements of science.

Our constitutional standards need to grow along with our greater understanding, but no further.

Wiggins, J., joins this special concurrence.

**APPEL, Justice (dissenting).**

I respectfully dissent.

Iowa Code sections 702.11 and 907.3 (2011) mandate that a district court impose prison time for all persons convicted of forcible felonies, thereby precluding the possibility that a juvenile might be placed on probation. The mandatory prison term is automatically imposed on adults and juveniles alike. The question in this case is whether these automatic, one-size-fits-all statutes may be applied equally to adults and to juveniles notwithstanding the observations of the United States Supreme Court and this court that because of their reduced moral culpability, children are "constitutionally different from adults for sentencing purposes" and this constitutional difference is not "crime-specific." *State v. Null*, 836 N.W.2d 41, 65 (Iowa 2013) (quoting *Miller v. Alabama*, 567 U.S. 460, ___, 132 S. Ct. 2455, 2464–65 (2012)).

**I. Recent Caselaw Related to the Application of the Cruel and Unusual Punishment Clauses of the United States and Iowa Constitutions to Juvenile Offenders.**

**A. Overview of Recent United States Supreme Court Cases.** In a series of cases, the United States Supreme Court has considered the application of the Cruel and Unusual Punishment Clause of the United States Constitution to sentencing children convicted of crimes committed while under the age of eighteen. *See Miller*, 567 U.S. 460, 132 S. Ct. 2455; *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010); *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005). In the now familiar trilogy of *Roper*, *Graham*, and *Miller*, the United States Supreme Court outlined a number of features of youth, concluding that children are "constitutionally different from adults for purposes of sentencing" and

that these differences were not "crime-specific." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464–65; *see also Graham*, 560 U.S. at 68, 130 S. Ct. at 2026; *Roper*, 543 U.S. at 572–73, 125 S. Ct. at 1197.

The United States Supreme Court based its determination that children are "constitutionally different from adults for purposes of sentencing" because of the characteristics of youth. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464. Among other things, the United States Supreme Court noted that youth have less developed judgment, that children do not manifest the same level of responsibility or maturity as adults, that they are more susceptible to negative influences and outside pressures— including peer pressure, and that the character and personality of a child are not developed to the same extent as an adult. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464; *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026; *Roper*, 543 U.S. at 569–70, 125 S. Ct. at 1195–96. As a result, juvenile offenders generally have less moral culpability for their crimes than adult offenders. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464–65. The United States Supreme Court emphasized that its observations about the diminished culpability of youth were not "crime-specific" but are generally applicable. *Id.* at ___, 132 S. Ct. at 2465.

Applying the above principles, the United States Supreme Court held that the Cruel and Unusual Punishment Clause of the United States Constitution (1) categorically prohibited the imposition of the death penalty on juvenile criminal offenders, *Roper*, 543 U.S. at 578–79, 125 S. Ct. at 1200; (2) categorically prohibited the imposition of life without the possibility of parole to juveniles for nonhomicide offenses, *Graham*, 560 U.S. at 82, 130 S. Ct. at 2034; and (3) prohibited the imposition of life imprisonment without the possibility of parole for homicide offenses unless a court determined, after an evidentiary hearing, that the juvenile

was one of those uncommon juveniles who demonstrated irretrievable depravity, *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475.

In reaching these conclusions, the *Roper–Graham–Miller* trilogy relied, at least in part, on neuroscientific developments, indicating a willingness to consider the scientific developments in evaluating constitutional issues.[4]  Further, in *Miller* particularly, the Supreme Court moved away from its reliance on societal consensus in evaluating claims under the Cruel and Unusual Punishment Clause of the Eighth Amendment and toward reliance on the Court's own independent judgment.  567 U.S. at ___, 132 S. Ct. at 2473; *see* John F. Stinneford, *Youth Matters:* Miller v. Alabama *and the Future of Juvenile Sentencing*, 11 Ohio St. J. Crim. L. 1, 4–5 (2013).  The United States Supreme Court also cited international norms, noting, for instance, that the United States was the only country in the world to give official sanction to the juvenile death penalty.  *Roper*, 543 U.S. at 575, 125 S. Ct. at 1198.[5]

A fundamental question after *Miller* has been whether the principles announced therein should be given a broad or narrow gloss. Initially, the battle lines were drawn over the question of whether the

---

[4]For a summary of the scientific developments, see Elizabeth Scott, et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 684–87 (2016).

[5]Aside from sentencing, the United States Supreme Court has recognized the differences between juveniles and adults in other criminal justice contexts.  On two occasions, the Supreme Court has barred the use of confessions obtained under circumstances that would have led to a different result if the suspect were an adult. *Gallegos v. Colorado*, 370 U.S. 49, 55, 82 S. Ct. 1209, 1213 (1962); *Haley v. Ohio*, 332 U.S. 596, 601, 68 S. Ct. 302, 304 (1948).  Further, in *J.D.B. v. North Carolina*, the Supreme Court held that a determination of whether a minor is in custody should take into account the age of the suspect.  564 U.S. 261, 265, 131 S. Ct. 2394, 2399 (2011); *see generally* Martin Guggenheim, Graham v. Florida *and a Juvenile's Right to Age-Appropriate Sentencing*, 47 Harv. C.R.-C.L. L. Rev. 457, 488–89 (2012) (noting that *J.D.B.* "mark[ed] a return to special protections for youth that characterized the Court's confession suppression caselaw more than half a century ago").

holding in *Miller* was merely procedural or substantive. The question was important, as procedural caselaw developments are generally not given retroactive effect, while substantive changes are generally applied retroactively.

Some courts took a narrow view of *Miller,* suggesting that it was only a procedural decision and therefore the decision was not retroactive. The general notion espoused by these courts was that *Miller* required only a hearing, but that the substance of the law changed little. *See, e.g.*, *People v. Carp*, 852 N.W.2d 801, 825 (Mich. 2014), *vacated sub nom. Davis v. Michigan,* ___ U.S. ___, 136 S. Ct. 1356 (2016); *Chambers v. State*, 831 N.W.2d 311, 328–31 (Minn. 2013), *overruled by Jackson v. State*, 883 N.W.2d 272, 279 (Minn. 2016). We joined other courts in viewing *Miller* broadly as substantive in nature. *See State v. Ragland*, 836 N.W.2d 107, 117 (Iowa 2013); *see also People v. Davis*, 6 N.E.3d 709, 722 (Ill. 2014); *Diatchenko v. Dist. Att'y*, 1 N.E.3d 270, 281 (Mass. 2013).

The United States Supreme Court settled this particular question in *Montgomery v. Louisiana,* 577 U.S. ___, 136 S. Ct. 718 (2016). In *Montgomery,* the Supreme Court held that *Miller* was substantive and should be given retroactive effect. *Id.* at ___, 136 S. Ct. at 736. In particular, the Court in *Montgomery* emphasized that the decision in *Miller* was not just a matter of process, but a matter of substance, namely, that because of the distinctive characteristics and the lessened culpability of youth, only in extremely rare cases could children be subject to life sentences without the possibility of parole even in cases involving homicide. *Id.* at ___, 136 S. Ct. at 733–34. The *Montgomery* Court suggested that states could meet the constitutional requirement of *Miller* by simply enacting statutes that eliminated juvenile life sentences without the possibility of parole. *See id.* at ___, 136 S. Ct. at 736.

After *Montgomery*, however, the battle lines moved but the fight continues.  Some seek to find ways to limit the scope of *Roper, Graham,* and *Miller* by asserting, for instance, that the principles apply only in the death penalty or life-without-the-possibility-of-parole contexts and do not apply to aggregate sentences that may add up to lengthy prison terms.

Proponents of a narrow reading of *Roper, Graham,* and *Miller* tend to minimize the statement in *Miller* that children are "constitutionally different" and the declaration that the principles enunciated in *Roper* and *Graham* are not "crime-specific."  *See, e.g., Graham,* 560 U.S. at 124, 130 S. Ct. at 2058 (Alito, J., dissenting) ("Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole."); *United States v. Reingold,* 731 F.3d 204, 214 (2d Cir. 2013) ("Much less does a five-year sentence equate to one of 'the law's most serious punishments' so as to raise the constitutional concerns identified in *Miller v. Alabama* about the mandatory application of life without parole to all juveniles." (quoting *Miller,* 567 U.S. at ___, 132 S. Ct. at 2471)); *Silva v. McDonald,* 891 F. Supp. 2d 1116, 1131 (C.D. Cal. 2012) ("Notwithstanding the holdings in *Roper, Graham,* or *Miller,* this Court is not aware of any controlling Supreme Court precedent which holds, or could be construed to hold, that the sentence at issue here of 40-years-to-life with the possibility of parole, for a juvenile . . . violates the Eighth Amendment.").

Proponents of a broad view believe the principles of *Roper, Graham,* and *Miller* apply outside the factual confines of the cases.  For instance, in *Casiano v. Commissioner of Correction,* the Connecticut Supreme Court applied the *Roper–Graham–Miller* trilogy to a fifty-year sentence without the possibility of parole, a term of years, even though *Roper, Graham,* and *Miller* involved only death or life-without-the-possibility-of-

parole sentences. 115 A.3d 1031, 1045, 1048 (Conn. 2015). A number of commentators have stressed the general applicability of the *Roper*, *Graham*, and *Miller* principles to criminal justice settings involving juveniles. *See, e.g.,* Cara H. Drinan, *The* Miller *Revolution*, 101 Iowa L. Rev. 1787, 1789 (2016) (characterizing *Miller* as "a revolutionary decision" that "portends a tremendous shift in juvenile justice policy and practice"); Barry C. Feld, *Adolescent Criminal Responsibility, Proportionality, and Sentencing Policy:* Roper, Graham, Miller/Jackson*, and the Youth Discount*, 31 Law & Ineq. 263, 317 n.287 (2013) ("[Adolescents'] crimes may be the same as those of adults, but these offenders simply are not adults and should not be sentenced as if they were." (quoting ABA, *The State of Criminal Justice* 329 (2007)); Martin Guggenheim, Graham v. Florida *and a Juvenile's Right to Age-Appropriate Sentencing*, 47 Harv. C.R.-C.L. L. Rev. 457, 458 (2012) [hereinafter Guggenheim] (arguing that, after *Graham*, "juveniles have a substantive constitutional right to be sentenced as juveniles and that mandatory sentencing schemes designed for adults may not be automatically imposed on juveniles without courts first conducting a sentencing hearing at which prosecutors must bear the burden of proving that the juvenile deserves the sentence"); Elizabeth Scott et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 676 (2016) [hereinafter Scott] ("[M]any lawmakers have concluded that the analysis and principles at the heart of the Supreme Court's constitutional framework have important implications for juvenile sentencing and parole regulation beyond the death penalty and [life without the possibility of parole].").

Those viewing *Miller* as establishing broad principles of law draw support from Chief Justice Roberts' dissent in *Miller*. In his dissent, he

agreed with those who saw the larger application of *Miller* principles. *Miller*, 567 U.S. at \_\_\_, 132 S. Ct. at 2481–82 (Roberts, C.J., dissenting). According to Chief Justice Roberts, by emphasizing that children are different, the majority in *Miller* announced a general principle of reduced culpability that applies not only to the crimes at issue in the cases but generally to the criminal conduct of young offenders. *Id.* at \_\_\_, 132 S. Ct. at 2481–82; *see also* Scott, 88 Temp. L. Rev. at 681. As will be seen below, our cases agree with the Chief Justice's assessment.

**B. Overview of Recent Iowa Supreme Court Cases.** We have considered the reasoning of the United States Supreme Court in *Roper*, *Graham*, and *Miller* in a series of juvenile cases in which challenges to sentences were raised under the cruel and unusual punishment provision of article I, section 17 of the Iowa Constitution. *State v. Sweet*, 879 N.W.2d 811 (Iowa 2016); *State v. Seats*, 865 N.W.2d 545 (Iowa 2016); *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014); *Ragland*, 836 N.W.2d 107; *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013); *Null*, 836 N.W.2d 41. These cases generally demonstrate a broad and consistent application of the *Roper–Graham–Miller* principles under article I, section 17 of the Iowa Constitution.

We began our response to *Roper, Graham,* and *Miller* in *Ragland*, 836 N.W.2d 107. In *Ragland*, we held that a life-without-the-possibility-of-parole sentence, even if commuted to a mandatory term of sixty years, violated the *Roper–Graham–Miller* principles under article I, section 17 of the Iowa Constitution. *Id.* at 122. In doing so, we explained that the substantive nature of the *Miller* holding limited the ability of the state to impose life without the possibility of parole without an individualized hearing. *Id.* at 114–17.

In *Null*, we modestly extended the approach in *Ragland* to a case in which a juvenile was sentenced to a mandatory term of 52.5 years. 836 N.W.2d at 45. In *Null*, we recognized that his 52.5-year sentence might not technically be life without the possibility of parole, but emphasized the application of the principles of *Roper*, *Graham*, and *Miller*. *Id.* at 72–73. Specifically, we stated "the notions in *Roper*, *Graham*, and *Miller* that 'children are different' and that they are categorically less culpable than adult offenders apply as fully in this case as in any other." *Id.* at 71.

We thus recognized that the teaching of *Roper*, *Graham*, and *Miller* is not crime specific. *Id.* at 72–73. In *Null*, we held that the *Roper–Graham–Miller* principles apply to lengthy prison terms imposed as a result of consecutive sentencing. *Id.* at 74.

Similarly, in *Pearson*, a seventeen-year-old offender convicted of two counts of first-degree robbery and two counts of first-degree burglary received a total cumulative sentence of fifty years and was not eligible for parole for thirty-five years. 836 N.W.2d at 91, 93, 96. As in *Null*, we noted that because " 'children are constitutionally different from adults,' they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing." *Id.* at 95 (quoting *Null*, 836 N.W.2d at 74). We concluded the *Roper–Graham–Miller* principles applied and that it should be "rare or uncommon" for children to receive a lengthy prison term without the possibility of parole for the crimes committed in the case. *Id.* at 96. We remanded the matter to the district court for resentencing. *Id.* at 97.

In *Lyle*, a seventeen-year-old offender convicted of robbery in the second degree was sentenced to a ten-year prison sentence with a mandatory minimum of seven years. 854 N.W.2d at 381. We held that the *Roper–Graham–Miller* principles applied, vacated the sentence, and

remanded the case to the district court for a *Miller*-type hearing. *Id.* at 404. We concluded,

> *Miller* is properly read to support a new sentencing framework that reconsiders mandatory sentencing for all children. Mandatory minimum sentencing results in cruel and unusual punishment due to the differences between children and adults. This rationale applies to all crimes, and no principled basis exists to cabin the protection only for the most serious crimes.

*Id.* at 402.

We further stated that "the sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." *Id.* at 398. We noted that individualized sentencing requires the sentencer to "look[] behind the label of the crime into the details of the particular offense and the individual circumstances of the child." *Id.* at 400–01. We again noted that the principles of *Roper*, *Graham*, and *Miller* are not crime specific. *Id.* at 399.

Since *Lyle*, there have been two additional juvenile cruel and unusual punishment cases under article I, section 17 of the Iowa Constitution. In *Seats*, we emphasized that in the context of a *Miller*-type hearing the district court was to consider the features of youth outlined in *Roper*, *Graham*, and *Miller* as mitigating factors, and we required specific factual findings before a juvenile was sentenced to a mandatory term. 865 N.W.2d at 555–58. In *Sweet*, we held that life without the possibility of parole was categorically prohibited under article I, section 17 of the Iowa Constitution. 879 N.W.2d at 839.

All the above cases emphasize several common themes drawn from *Roper*, *Graham*, and *Miller*. First, we have repeatedly stated that for purposes of the cruel and unusual punishment provision of article I,

section 17, "children are different." *Pearson*, 836 N.W.2d at 96; *Null*, 836 N.W.2d at 71. Second, we have repeatedly emphasized that the differences between children and adults are not "crime specific." *Lyle*, 854 N.W.2d at 401; *Null*, 836 N.W.2d at 70.

We have thus not limited *Roper*, *Graham*, and *Miller* to their specific factual context of life without the possibility of parole, as some have urged, but have instead applied the principles to mandatory prison terms of sixty years, 52.5 years, thirty years, and seven years. Further, we have emphasized that youth is a mitigating factor and that district courts should engage in detailed fact-finding before coming to the conclusion that adult sentences may be appropriate for juvenile offenders. *Seats*, 865 N.W.2d at 557–58; *Null*, 836 N.W.2d at 70. Finally, we have repeatedly emphasized that the fact that a youth is approaching eighteen years of age does not defeat application of the *Roper–Graham–Miller* principles. *Sweet*, 879 N.W.2d at 831; *Null*, 836 N.W.2d at 55.

**II. Application of Principles Under Article I, Section 17 of the Iowa Constitution.**

In this case, the offender has been convicted of offenses involving a forcible felony. The legislature has determined that these offenses tend to be more serious than nonforcible offenses and, as a result, a mandatory prison term is required for all offenders, including juvenile offenders.

The problem, however, is that under these statutes, juveniles and adults are treated the same. There is no recognition that juveniles are "constitutionally different" from adults and there is no recognition that this difference is not "crime specific." Thus, two of the bedrock principles of *Roper*, *Graham*, and *Miller*, as applied in our cases, are offended by the

undiscriminating nature of the statutes. *See, e.g., Pearson,* 836 N.W.2d at 96; *Null,* 836 N.W.2d at 71–72.

Further, the application of the statutes, in this and every case, amounts to a de facto mandatory minimum prison term. Under these statutes, a juvenile offender will serve what amounts to a mandatory prison term of some length. Although formally eligible for parole from day one, it is clear, as a practical matter, that no action will be taken until the offender has been incarcerated for some period of time. It amounts to a de facto mandatory minimum sentence of undetermined length.

It is, of course, true that the offender is eligible for parole from day one. But this is form over substance. We have crossed the form over substance bridge before. In *Ragland,* the argument was made that a sixty-year mandatory prison term was not life without the possibility of parole and thus was outside the *Roper–Graham–Miller* principles. 836 N.W.2d at 121. We rejected the claim, noting that the reasoning in *Graham* applies to life without the possibility of parole and to terms that are its practical equivalent. *Id.*

A mandatory minimum prison term of six months applied indiscriminately to juveniles and adults would certainly violate *Lyle* principles. An indefinite mandatory prison term applied to both juveniles and adults suffers from the same kind of infirmity. Under the circumstances, we think the better approach is to allow a juvenile offender the opportunity to demonstrate why he or she should be treated differently than an adult.

Under the teaching of *Roper, Graham,* and *Miller* as implemented in the *Ragland–Null–Pearson–Lyle–Seats–Sweet* line of cases, the features of youth—namely, the impetuousness, the recklessness, the susceptibility

to peer pressure, the lack of judgment—are not crime specific. They are applicable to *all* crimes. In *Lyle*, we declared application of these principles prevents the legislature from categorically imposing a mandatory minimum prison sentence that treats all juvenile offenders as if they were adults and refuses to allow a court to recognize the decreased culpability of youth. 854 N.W.2d at 402. Thus, in *Lyle,* we held that a seven-year mandatory minimum sentence could not be imposed without a hearing to consider the impact of the characteristics of youth in lessening criminal culpability. *Id.*

The defect of the statutes in this case is that they mandatorily apply to all juveniles and adults. They focus solely on the crime and prohibit in all cases consideration of the diminished culpability of a juvenile offender. *See* Guggenheim, 47 Harv. C.R.-C.L. L. Rev. at 490–91 ("When the only inquiry made by the sentencing court is to consult the legislature's mandatory punishment for the crime, without any further inquiry into whether the punishment is appropriate for a juvenile, for no other reason that it is appropriate for an adult, the Constitution requires more."). Juveniles generally have less culpability than adults, and if that is true, they generally should receive lesser punishment for the same crime.

Further, there may well be circumstances, for instance, in which a juvenile offender is convicted of aiding and abetting under circumstances in which the offense occurred but was not intended by the juvenile, the juvenile had no direct involvement in the crime, and the *Roper–Graham–Miller* factors weigh strongly in favor of diminished culpability. As we noted in *Lyle*, "A forcible felony can be the product of inane juvenile schoolyard conduct just as it can be the product of the cold and

calculated adult conduct most people typically associate with a forcible felony . . . ." 854 N.W.2d at 401.

Could a mandatory prison term be automatically imposed on Propps without an opportunity to show diminished culpability in a *Miller*-type hearing? I think not. Under our cases, and particularly under *Lyle*, a juvenile offender is entitled to a judicial determination that an indefinite period of incarceration for the individual defendant is not so disproportionate as to result in cruel and unusual punishment.

I recognize there are alternative theories that could affirm the district court in this case. For instance, it could be argued that the only automatic or mandatory result of the statutes is a relatively short period of confinement before a juvenile is considered for parole and that, in the case of forcible felonies, such a relatively brief period of mandatory imprisonment is constitutional as applied to all juvenile offenders. This rationale has some appeal. Yet, the mandatory nature of incarceration is much more appropriate for adults than for children with categorically diminished culpability. Further, some forcible felonies may be very serious offenses, while others less so. Finally, the difference between incarceration for a few months and potential probation is substantial and more than just a mere matter of calendar time. A prison term even for a relatively short period of time is crossing of a major Rubicon for the juvenile offender. A trip to the big house, no matter how brief, is not a *de minimis* event.

Another possibility would be to short circuit the *Miller* procedure in this case because of the unattractive nature of the facts so far developed. At the age of seventeen, Propps shot a person four times. No one would argue that the conduct of Propps amounted to inane schoolyard misconduct. *See Lyle,* 854 N.W.2d at 401. These facts alone make him

a strong candidate for incarceration as reflected in the district court's imposition of four consecutive ten-year sentences.

Yet, Propps is entitled to attempt to make his *Miller* case before the district court. We do not deprive criminal defendants of procedural rights merely because of their perceived lack of merit. Just as a seemingly obviously guilty defendant is entitled to demand a fair trial, a juvenile offender is entitled to attempt to show that his diminished culpability recognized in *Roper, Graham,* and *Miller* requires that he or she be treated differently than adults for sentencing purposes. In short, we are confronted in this appeal with *a question of law and procedure,* not a question focusing on the specific facts and circumstances of Propps and his crimes.

I would thus remand this case to the district court for further proceedings. Nothing in this opinion, of course, precludes an appropriate prison sentence for Propps. What is precluded, under our approach to the *Roper–Graham–Miller* principles, is a statutory scheme imposing mandatory prison terms that categorically treat children the same as adults without affording *an opportunity* to show the diminished culpability of youth requires a different outcome. I would decide this case on this narrow, but important point.

For the reasons stated above, I respectfully dissent.

Hecht, J., joins this dissent.